[Civ. No. 42357. Second Dist., Div. Two. June 26, 1974.]

O'CONNOR BROS. ABALONE CO., Plaintiff and Respondent, v.
MARLON BRANDO, JR., Defendant, Cross-complainant and Appellant;
MOVITA BRANDO, Defendant, Cross-defendant and Respondent.

## COUNSEL

Rosenfeld, Meyer & Susman and Stephen A. Kroft for Defendant, Cross-complainant and Appellant.

O'Connor & Wood and Timothy M. O'Connor for Plaintiff and Respondent.

Peter Andrew Notaras for Defendant, Cross-defendant and Respondent.

## OPINION

**COMPTON, J.**—In July of 1968, in connection with the annulment of their marriage, Marlon and Movita Brando executed a written agreement purporting to settle certain financial matters and child custody rights.

As a part of that agreement Marlon undertook to make monthly payments of $600 for the support of the minor children and monthly payments of $1,400 for the support of Movita. Only the latter payments to Movita are at issue here.

In August of 1969, O'Connor Bros. Abalone Co. (O'Connor) obtained a judgment against Movita for a sum in excess of $55,000, a major portion of which remained unsatisfied as of April 1971, at which time O'Connor attempted to levy on funds allegedly due from Marlon to Movita by virtue of the aforementioned agreement. Marlon denied that any funds were due.

O'Connor then initiated the present action in which Marlon and Movita were joined as defendants. Marlon cross-complained against Movita for declaratory relief.

At the trial O'Connor produced evidence of the prior judgment and the nonpayment. Marlon then put on evidence in defense to the complaint and in support of his cross-complaint. At the conclusion of this evidence the trial court granted motions by O'Connor and Movita for judgment under Code of Civil Procedure section 631.8.[1]

---

[1]Code of Civil Procedure section 631.8 provides: "After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, in which case the court shall make findings as provided in Sections 632 and 634 of this

The resolution of this dispute turns on whether, under the terms of the agreement between Marlon and Movita, her conduct was such as to terminate Marlon's obligation to make further payments. The crucial provision in the agreement is as follows: "(a) Defendant agrees to pay or cause to be paid to Plaintiff, the amount of $1,400.00 per month commencing on the first day of the calendar month next succeeding the month in which this Agreement is executed and continuing for a period of one-hundred fifty-six (156) months, or *until she remarries or dies, whichever occurs sooner. For the purpose of this Agreement, 'remarriage' shall include, without limitation, Plaintiff's appearing to maintain a marital relationship with any person, or any ceremonial marriage entered into by Plaintiff even though the same may later be annulled or otherwise terminated or rendered invalid."* (Italics added.)

In reliance on this "remarriage" clause, Marlon ceased to make the payments in April 1971. He contends that in 1968, Movita entered into a relationship with one James Ford which relationship was within the provisions of the term "remarriage" as defined in the agreement.

The trial court expressed its interpretation of the agreement in a conclusion of law as follows:

"That the marital settlement agreement incorporated and merged in the judgment of annulment in its provisions, paragraph (2)(a) defining 'remarriage' means that cross-defendant, Movita Brando, and any person live, conduct themselves and speak in such a way that any person with the opportunity to observe them would reasonably be led to believe that they were married."

In the latter part of 1968, and up until June of 1969, Movita resided at a home on Coldwater Canyon Drive in Beverly Hills. Findings of fact filed by the trial court were that (1) Ford and Movita "lived" at that residence, and (2) that from time to time Ford and Movita had sexual intercourse at that location.

On the other hand, the trial court found that Movita from June 30, 1968 on, "did not live, conduct herself, or speak in such a manner that any person with the opportunity to observe [her] would reasonably conclude that she was married within the terms of the agreement . . . ."

For the purposes of our review, the evidence which was offered in the

---

code, or may decline to render any judgment until the close of all the evidence. Such motion may also be made and granted as to any cross-complaint.

"If the motion is granted, unless the court in its order for judgment otherwise specifies, such judgment operates as an adjudication upon the merits."

trial court can be divided into two categories, (1) the evidence of the conduct of Movita and Ford which establishes the facts of their relationship, and (2) the evidence bearing on the meaning and purpose of the agreement between Marlon and Movita.

The evidence in the trial left little doubt that Movita and Ford enjoyed a relationship of substantial duration, which relationship bore the objective indicia of marriage. By their own admission they engaged in frequent sexual intercourse. Ford kept his clothes at the residence in Coldwater Canyon, he ate meals there, many of which he prepared. Ford frequently purchased groceries for their meals by charging them to Movita's account at the market, he drove her cars and was authorized to use her charge account at one of the major department stores.

Additionally, Ford on significant occasions gave the Coldwater Canyon address as his own. He used that address in applying for a driver's license and in reporting to his probation officer. The two were often in company together and in company with Movita's children in public.

The trial court's finding that they "lived" together is well supported. The further finding that such relationship could not be reasonably interpreted as indicating that Ford and Movita were in fact married. apparently flowed from the absence of any evidence that they told anyone they were married.

The parties' real dispute centers on whether the above described relationship is one contemplated by the agreement. Extrinsic evidence was offered in testimony by Marlon, Movita and Marlon's attorney, Mr. Garey, as to the intent of the parties at the time the agreement was executed. Although Marlon requested specific findings pursuant to Code of Civil Procedure section 634, the trial court refused to make findings as to the credibility of the witnesses who testified on the issue of the intent of the parties.

We here summarize the position of the respective parties. O'Connor contends, and the trial court concluded, that the phrase "appearing to maintain a marital relationship" means a holding out by Movita that she was in fact married or conduct on her part that would imply a marriage in fact. According to this version, a meretricious relationship, no matter how intimate and enduring, would not terminate the obligation for support payments so long as it was made clear to the world that Movita and her paramour were *not* married. This interpretation would place a premium on the persistence with which Movita publicized the illicit nature of the relationship.

On the other hand, Marlon contends that the agreement was designed to prevent Movita from maintaining a relationship with a male companion as a result of which the latter appeared to enjoy the usual rewards of marriage without assuming the obligations which flow from a ceremony of marriage. According to Marlon the agreement means a "marital type" relationship and such interpretation is necessary to avoid what he sought to avoid, i.e., the possibility that Movita's male companion, in sharing Movita's shelter, bed and board, would also benefit from the support payments which Marlon was providing.

■ The interpretation of a contract is purely a question of law and an appellate court must make its own independent interpretation. (*Flores* v. *Barman,* 130 Cal.App.2d 282 [279 P.2d 81].)

■ Where extrinsic evidence has been offered and received as an aid to construing a contract, the trial court as the finder of fact may, on the basis of substantial evidence, make a binding determination of what facts are established by the extrinsic evidence where there is a conflict in that evidence. (*Citizens Suburban Co.* v. *Rosemont Dev. Co.,* 244 Cal.App.2d 666, at p. 678 [53 Cal.Rptr. 551].)

Once the facts are determined, or where there is no conflict in the extrinsic evidence, the interpretation of the agreement in the light of those facts is a question of law. (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839].)

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.)

■ Here Marlon testified his intent was ". . . that I was not to pay for any man that she might be living with through the support payments; that if she were going to live with somebody, then they would have to support her, and it would not fall to me, outside of the support for the children, it would not fall to me to pay for her continuing support." Movita testified that she understood that if she "lived" with another man the support payments would stop.

Mr. Garey the attorney testified that his client Marlon's and his intent were to provide for terminating the payments if Movita lived with another man who would benefit from the support payments and if the relationship would be demeaning to Marlon in the eyes of the public.

The final agreement evolved from two previously written drafts. The first draft simply used the phrase "until she remarries" without further

definition. To this Marlon objected. The second draft defined remarriage as "cohabitation by plaintiff with any person." To this Movita objected.

Mr. Garey testified that Movita's attorney indicated that the objection to "cohabitation" was based on a fear that the word might apply to so-called "one night stands."

Thus the extrinsic evidence as to the intent of the parties was not in conflict and as noted the trial court did not indicate that it disbelieved any of this evidence. Since Marlon requested specific findings on the subject we cannot, in support of the judgment, infer such disbelief. (Code Civ. Proc., § 634.) This evidence was clearly consistent with the apparent purpose of the agreement.

Clearly the purpose of the agreement was not to circumscribe Movita's sexual activity per se as she was free to engage in sexual intercourse with other men. The agreement sought to embrace actual ceremonial marriages on the one hand and on the other, relationships which were not marriages but which had the attributes of marriage such as companionship of substantial duration, the sharing of habitation, eating together and sexual intimacy. The characterization of such a relationship as "marital" does not depend on whether third persons are led to believe the existence of a ceremonial marriage. In fact, public belief that Movita and Ford were actually married would be less demeaning to Marlon than their conduct of "living" together while disavowing an actual marriage.

What is important here from the standpoint of the objectives of the agreement is that such a relationship creates the strong probability that the male partner will derive benefit from the support payments. And that, in fact, is what occurred here. O'Connor contends in its brief that there was no common financial or economic relationship between Ford and Movita and that this detracts from the "marital" character of the relationship. Interestingly enough, however, in respondent's support of this argument it is admitted that Movita paid for the upkeep of her cars which Ford drove. She paid for the groceries which Ford charged, and she paid for the department store purchases which Ford charged. It appears without contradiction that Movita paid for the maintenance of the house in which they lived.

We interpret the phrase "appearing to maintain a marital relationship" as including the appearance of "living together" under circumstances such as existed here, whether or not there is the appearance of marriage in fact. This appears to us to be the only possible reasonable interpretation of the agreement.

When viewed in light of the proper interpretation of the agreement, the findings fail to support the judgment. Since this was an appeal from a judgment entered under Code of Civil Procedure section 631.8, we cannot simply enter judgment for the prevailing party but must remand the matter to the trial court for further proceedings.

The judgment is reversed.

Roth, P. J., and Beach, J., concurred.

The petition of all the respondents for a hearing by the Supreme Court was denied August 21, 1974.