# Theodore L. Schweider

## v.

# Katja A. Schweider

Record No. 910604

February 28, 1992

Present: All the Justices

Michael A. Ward (Gannon, Cottrell & Ward, on briefs), for appellant.

William L. Schmidt (Marco A. Lopez; Richard A. Miller; Marlene M. Hahn, on brief), for appellee.

JUSTICE STEPHENSON delivered the opinion of the Court.

The dispositive issue in this appeal is whether a former wife has "remarried" as defined in a property settlement agreement, thereby terminating the former husband's payment obligations pursuant to the agreement.

Katja A. Schweider (the wife) sued Theodore L. Schweider (the husband), claiming that the husband breached a marital property settlement agreement and seeking damages for arrearages. In defense, the husband claims that his obligations to the wife under the agreement terminated because the wife had "remarried" within the meaning of the agreement. The trial court found in favor of the wife and entered a judgment awarding the wife damages in the amount of $6,849.85. The husband appeals.

The material facts are undisputed. In 1983, the husband and the wife were experiencing marital difficulties and entered into the property settlement agreement which, in pertinent part, provides as follows:

> 16. *Termination.* The husband's payments of military income or retirement pay to the wife shall terminate upon his death or wife's death or remarriage.

> 17. *Cohabitation.* The term "remarriage" for purposes of terminating support shall include the wife's permanent cohabitation with a male as if to all appearances they were otherwise married, the word "permanent" to mean residence of more than thirty days.

The husband and the wife divorced in 1984.

The wife met Khaled Al-Rashoudi in 1986. In November 1988, Al-Rashoudi began staying overnight with the wife at her apartment. At first, he spent the night approximately once a week. At periods of time thereafter, he spent four or five nights a week.

When Al-Rashoudi stayed overnight at the apartment, he always slept in the wife's bedroom, either in her bed or on a sofa. He brought his clothes to the apartment and left some clothes there when he went to work the next day.

On June 3, 1989, the wife and Al-Rashoudi entered into a contract to purchase a single-family dwelling in the City of Alexandria. They jointly applied for a mortgage loan to finance the unpaid balance of the purchase price.

When settlement on the purchase occurred, both the wife and Al-Rashoudi signed all of the settlement documents, including deed of trust notes and deeds of trust. They certified that they intended the property as their principal place of residence.

The deed conveyed to them, as tenants in common, undivided one-half interests in the property as their sole and separate equitable estates. The wife paid $5,500 and Al-Rashoudi paid $15,500 toward the down payment on the purchase price. However, because they had agreed to purchase the property on a "fifty-fifty" basis, the wife gave Al-Rashoudi an "I.O.U." for the difference.

Immediately following the settlement, the wife moved into the residence, and Al-Rashoudi moved in one week later. Since then, both have resided in the residence continuously.

The wife and Al-Rashoudi periodically shared a bedroom at their residence. According to the wife, she and Al-Rashoudi had sexual intercourse "[o]ccasionally, but not frequently," or approximately once a month from 1988 until the time of the trial. Al-Rashoudi testified that he and the wife last engaged in sexual relations approximately two weeks prior to the trial.

The wife and Al-Rashoudi shared closet space in the master bedroom and at other locations in the house. They also shared each other's furniture. The wife and Al-Rashoudi regularly drove to work together. However, they split the gasoline costs. Occasionally, they ate meals together, but neither cooked for the other. They did their own laundry and shared the responsibility for cleaning the house. They also shared certain common expenses, such as mortgage, utilities, and maintenance payments.

The wife and Al-Rashoudi have no joint bank accounts. Each has a retirement benefit plan, but neither is the named beneficiary of the other's plan. They characterize their relationship as one of economic necessity.

The property settlement agreement provides that the husband's payments to the wife "shall terminate upon . . . [the] wife's . . . remarriage." The agreement defines the term "remarriage" to include "the wife's permanent cohabitation with a male as if to all appearances they were otherwise married." The agreement defines the word "permanent" as "residence of more than thirty days."

 We have said that the term "cohabit" means "to live together in the same house as married persons live together, or in the manner of husband and wife." *Johnson* v. *Commonwealth*, 152 Va. 965, 970, 146 S.E. 289, 291 (1929). While engaging in sexual relations is a factor in determining cohabitation, " 'matrimonial cohabitation' consists of more than sexual relations. It also imports the continuing condition of living together and carrying out the mutual responsibilities of the marital relationship." *Petachenko* v. *Petachenko*, 232 Va. 296, 299, 350 S.E.2d 600, 602 (1986); *see Colley* v. *Colley*, 204 Va. 225, 228-29, 129 S.E.2d 630, 632 (1963).

We previously have not interpreted and applied provisions in a property settlement agreement similar to the ones presented in the present case. However, courts in at least two other jurisdictions have considered similar provisions.

In *Bell* v. *Bell*, 393 Mass. 20, 468 N.E.2d 859 (1984), *cert. denied*, 470 U.S. 1027 (1985), a separation agreement provided that a husband's obligation to pay alimony would cease if the wife lived " 'with a member of the opposite sex, so as to give the outward appearance of marriage.' " *Id.* at 21, 468 N.E.2d at 860. The evidence established that, from March 1978 until June 1978, the wife resided "part of the time" in another man's apartment and that, from June 1978 through October 1979, the wife resided "on a regular basis" in the other man's apartment. *Id.* Additionally, from June 1978 through May 1981, the wife " 'on a regular basis cohabited with [the other man] . . . during which time they shared the same bedroom.' " *Id.* In terminating the alimony, the Supreme Judicial Court of Massachusetts observed that the pertinent phrase of the agreement "focused on the possibility of the [wife's] sharing a home with a man." *Id.* at 22, 468 N.E.2d at 860. The court further stated the following:

Clearly, the parties [to the agreement] thought that a man and a woman could live together in a way that would normally be associated with being married without their actually being married and without claiming or acknowledging a marriage relationship. It is difficult to conceive of what conduct the parties [to the agreement] contemplated if that conduct did not at least include the [wife's] sharing a bedroom with a man on a regular basis for approximately three years.

*Id.* at 22, 468 N.E.2d at 860-61.

In *O'Connor Bros. Abalone Co.* v. *Brando*, 40 Cal. App. 3d 90, 114 Cal. Rptr. 773 (1974), an agreement provided that a wife's right to alimony would be terminated if she remarried and that, for the purposes of the agreement, " ' "remarriage" shall include . . . [the wife's] appearing to maintain a marital relationship with any person.' " *Id.* at 93, 114 Cal. Rptr. at 774. The evidence showed that, from late 1968 until June 1969, the wife and another man lived in the same residence and had sexual intercourse "from time to time." *Id.* Although the wife and the other man did not hold themselves out as being married, the California court held that their relationship was a "remarriage" within the meaning of the agreement. *Id.* at 96, 114 Cal. Rptr. at 776. Summarizing its holding, the court stated the following:

> We interpret the phrase "appearing to maintain a marital relationship" as including the appearance of "living together" under circumstances such as existed here, whether or not there is the appearance of marriage in fact. This appears to us to be the only possible reasonable interpretation of the Agreement.

*Id.*

In the present case, the uncontroverted evidence establishes that the wife and Al-Rashoudi lived together in the same house on a permanent basis and shared the living expenses on a "fifty-fifty" basis. For a substantial amount of time, they shared the same bedroom and bed. It also is undisputed that, from 1988 to the time of trial, they engaged in an ongoing sexual relationship.

In spite of this uncontradicted evidence, the wife and Al-Rashoudi contend, and the trial court concluded, that this living arrangement was only one of economic necessity and convenience. The trial court stated that the arrangement "looks more like

roommates than it does like marriage." The husband counters by asserting that "[t]he economic inter-dependence of the Wife and Al-Rashoudi on which the Wife seems to rely so heavily in actuality gives their relationship *more* the appearance of a marriage rather than less, especially as it might relate to marriages today where both spouses frequently work." (Emphasis in original.)

The findings of a trial court after an *ore tenus* hearing should not be disturbed on appeal unless they are plainly wrong or without evidence to support them. A trial court's conclusion based on undisputed evidence, however, does not have the same binding weight on appeal. *Hankerson* v. *Moody*, 229 Va. 270, 274, 329 S.E.2d 791, 794 (1985); *Durrette* v. *Durrette*, 223 Va. 328, 332, 288 S.E.2d 432, 434 (1982); *Clark* v. *Clark*, 209 Va. 390, 395, 164 S.E.2d 685, 689 (1968). Moreover, a fact finder may not arbitrarily disregard uncontradicted evidence that is not inherently incredible. *Hankerson*, 229 Va. at 274, 329 S.E.2d at 794; *Cheatham* v. *Gregory*, 227 Va. 1, 4, 313 S.E.2d 368, 370 (1984).

Although the trial court's conclusion is to the contrary, we think the undisputed evidence establishes, as a matter of law, that the wife's relationship with Al-Rashoudi constituted "remarriage" within the meaning and intent of the property settlement agreement. We cannot conceive of what conduct the husband and the wife contemplated if that conduct did not include at least the wife's sharing a bedroom with another man for a substantial amount of time since 1988. Accordingly, we will reverse the trial court's judgment and enter final judgment in favor of the husband.

*Reversed and final judgment.*