COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Annunziata and Senior Judge Duff
Argued at Alexandria, Virginia


JOHN DAVID PELLEGRIN
                                              OPINION BY
v.   Record No. 2142-98-4         JUDGE ROSEMARIE ANNUNZIATA
                                            MARCH 14, 2000
DIANE LYNN BINGMAN PELLEGRIN


          FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                    Leslie M. Alden, Judge

        John D. Pellegrin, pro se.

        David M. Levy (Surovell, Jackson, Colten &
        Dugan, on brief), for appellee.


     John David Pellegrin ("husband") appeals from the decision

of the trial court, claiming it erred in refusing to terminate

spousal support.  Husband specifically contends that the court

(1) improperly declined to impute income to his former spouse,

Diane Lynn Bingman Pellegrin ("wife"); (2) failed to consider

wife's gross income earned from rental properties that she

owned; (3) failed to consider husband's disability; and (4)

failed to find wife was cohabiting on a "substantially

full-time" basis with her paramour, all in contravention of

various provisions of the parties' Property Settlement Agreement

("PSA") governing spousal support.  Husband also contends the

trial court erred in awarding attorney's fees to wife.

The parties were divorced by final decree of the Circuit Court of Fairfax County on March 5, 1991. The decree incorporated the parties PSA, whose provisions provide the basis of husband's claims on appeal. The trial court denied husband's petition seeking to terminate the spousal support he was obligated to pay to wife under the PSA.

## I.

Husband first contends the trial court erred in denying his petition to terminate support because the court failed to impute income to wife. The court's ruling is based on its construction of the PSA and its conclusion that since the agreement did not expressly require wife to seek and obtain employment, income could not be imputed to wife.

Husband contends the obligation is established by implication, noting Section 8 of the PSA, which reads, in pertinent part:

> If, as of May 1, 1995, the wife is employed or thereafter becomes employed with an annual gross income in excess of $25,000, husband's obligation to pay spousal support and maintenance shall be reduced by 50 percent of the amount by which wife's gross annual income exceeds $25,000, or by fifty percent of the amount by which wife's monthly income exceeds $2,083.33.

The PSA also provides:

> [S]pousal support payments . . . shall in any event be reduced to a maximum of Two Thousand Dollars ($2,000.00) per month,

- 2 -

> after wife's graduation from college, or June 1, 1997, whichever first occurs.

Finally, the PSA, also provides that husband "shall pay, or cause to be paid, the tuition and related fees, not including room and board, for wife in any college, university with an accredited undergraduate and/or graduate degree program in which wife is enrolled, husband's liability and responsibility as to same to terminate as of June 1997 . . . . ."

Husband contends that because the PSA required him to pay for wife's college and graduate school education, and contemplated decreases in his obligation to support her as her income increased, the PSA should be construed as requiring wife to seek employment. We agree.

It is well established that a property settlement agreement is a contract between the parties and that their rights and obligations are defined under it. See Douglas v. Hammett, 28 Va. App. 517, 523, 507 S.E.2d 98, 101 (1998) (separation agreements and property settlement agreements are contracts); Jones v. Jones, 19 Va. App. 265, 268-69, 450 S.E.2d 762, 764 (1994) ("[W]e must apply the same rules of interpretation [to property settlement agreements as are] applicable to contracts generally."); Tiffany v. Tiffany, 1 Va. App. 11, 15, 332 S.E.2d 796, 799 (1985). "'"[W]here a contract is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself

- 3 -

. . . ."'"  Harris v. Woodrum, 3 Va. App. 428, 432, 350 S.E.2d 667, 669 (1986) (quoting Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983) (quoting Globe Co. v. Bank of Boston, 205 Va. 841, 848, 140 S.E.2d 629, 633 (1965))).  In determining the intent of the parties, courts will generally not infer covenants and promises which are not contained in the written provisions.  However,

> what is necessarily implied is as much a part of the instrument as if plainly expressed, and will be enforced as such.  If the language of the instrument leaves the meaning of the parties in doubt, the court will take into consideration the occasion which gave rise to it, the obvious design of the parties, and the object to be attained, as well as the language of the instrument itself, and give effect to that construction which will effectuate the real intent and meaning of the parties.

Va. Ry. & Power Co. v. City of Richmond, 129 Va. 592, 611, 106 S.E. 529, 536 (1921) (citing Southern Ry. Co. v. Franklin Co., 96 Va. 693, 32 S.E. 485 (1899)).  In determining the parties' intent, courts

> are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation which the parties who made the contract occupied, so as to view the circumstances as they viewed them and so to judge of the meaning of the words and of the correct application of the language to the things described.

- 4 -

Talbott v. Richmond & Danville R. R. Co., 72 Va. (31 Gratt) 685 (1879); see also Paul v. Paul, 214 Va. 651, 653, 203 S.E.2d 123, 125 (1974) ("Ascertainment of the intent of the contracting parties is the cardinal rule in the construction of agreements. To do that the court will put itself in the situation occupied by the parties and look to the language employed, the subject matter and purpose of the parties, and all other pertinent circumstances.").

In the case before us, the record establishes that the parties agreed that husband's support obligation would be diminished as wife's income from employment increased. That wife would become employed was clearly within the contemplation of the parties. Furthermore, the parties agreed that the support obligation was keyed, in part, to wife earning her undergraduate degree, at which time husband's obligation to support was to diminish by a set amount. Furthermore, husband specifically agreed to pay the costs of wife's undergraduate and/or graduate degrees, an obligation which was to terminate seven years after the PSA was entered, specifically, June 1997. Given the circumstances attending the agreement, and the object to be attained, viz., that the level of support which wife could enjoy under the terms of the PSA was made dependant upon her ability to contribute to her own support or become wholly self-supporting, and that, in any event, wife's support would be

- 5 -

reduced by a set amount upon obtaining her undergraduate degree, it follows, by implication, that the parties contemplated that wife would assume responsibility for her support within her capacity to earn income. In sum, we find that husband's agreement to pay for wife's educational costs after they divorced relates to wife's capacity to earn income, and when read together with the provisions requiring a reduction of support in relation to wife's earned income, established an implied contractual duty upon wife to make a reasonable effort to seek employment, at least, upon completion of her degree. Accordingly, because the trial court erred in finding no such duty arose from the terms of the contract, we remand for further proceedings based on the evidence presented.

## II.

Husband further argues that rental income enjoyed by wife should be treated as "income from employment," but this contention previously was raised by husband in an earlier appeal and rejected by this Court in Pellegrin v. Pellegrin, No. 0143-96-4 (Va. Ct. App. Oct. 29, 1996). This issue therefore is barred as res judicata, and it will not be addressed further.

## III.

Husband argues also that his obligation to pay spousal support should have been terminated or reduced under the terms

of the PSA because he is disabled.  The provision at issue states:

> The parties agree that the [husband's] obligation to pay spousal support hereunder shall be subject to modification in the event of [husband's] disability causing reduction or loss of income on his part . . . .

Husband failed to prove that he is disabled and that the disability caused a reduction in his income; indeed, he testified that he is "working harder than ever in his life," providing evidence which belies his claim of disability.  This testimony plainly contradicted husband's earlier testimony as to a purported medical disability.  Furthermore, husband presented no evidence that his medical disability, if any were proven, caused his claimed reduction in income, as required by the PSA.  Consequently, we find no error in the trial court's conclusion that husband's health did not render him "disabled" within the meaning of the PSA.

Furthermore, we find no merit in husband's contention that the word "disability" should not be limited to a disability personal to him and should be extended to encompass diminished ability to earn sufficient income due to factors such as down-turns in the economy, his employment status, or changes in his client base.  Section 8 of the PSA makes clear that the meaning ascribed to the term "disability" as contemplated by the parties was one personal to him.

Indeed, the law of the Commonwealth governing the disabled is consistent with that of the United States in deeming that a "'person with a disability' means any person who has a physical or mental impairment that substantially limits one or more of his major life activities . . . ."  Code § 51.5-3; cf. 42 U.S.C.A. § 12102(2)(A).  Because of Section 8's patent concern with the earning capacity of the husband, the term "disability" as used in that section may only be inferred to concern a disability personal to him.

In addition to the commonly accepted meaning of the term "disability" as applied in pertinent law, Section 8 of the PSA states clearly that the disability in question must inhere in the husband.  As is patent in husband's argument, the reduction of income of which he complains was caused by the financial vicissitudes of third parties; the PSA requires that the reduction or loss of income result from husband's disability. If the parties had intended that term to include unexpected business losses, they should have, and could have, specified that intent in their agreement.  Having failed to do so, we will not redefine "disability" to render it broader than its common usage and its context within the PSA suggests.

## IV.

Next, husband contends that the trial court erred in denying his petition for a reduction of spousal support because

- 8 -

wife cohabits on a "substantially full-time" basis with her paramour in contravention of Section 8 of the PSA. That section provides, in pertinent part, that spousal support shall terminate if the wife "for any period of one month or more cohabits on a full-time or substantially full-time basis with a male non-relative." Thus, whether the husband's contention is valid depends upon the meaning of the word "cohabit" as contemplated by the PSA. See Bergman v. Bergman, 25 Va. App. 204, 211-12, 487 S.E.2d 264, 267 (1997); Smith v. Smith, 3 Va. App. 510, 513, 351 S.E.2d 593, 595 (1986) ("In Virginia, property settlement agreements are contracts subject to the same rules of formation, validity, and construction as other contracts.").

The PSA in question does not define the word "cohabit." The term has been the subject of judicial construction in various contexts, however. See, e.g., Schweider v. Schweider, 243 Va. 245, 248-49, 415 S.E.2d 135, 137 (1992) (construing the term within the context of a PSA); Petachenko v. Petachenko, 232 Va. 296, 299, 350 S.E.2d 600, 602 (1986) (considering what constituted sufficient "cohabitation" to terminate a period of marital desertion); Tarr v. Tarr, 184 Va. 443, 35 S.E.2d 401 (1945) (deciding what constituted "cohabitation" condoning a spouse's adultery); Johnson v. Commonwealth, 152 Va. 965, 970, 146 S.E. 289, 291 (1929) (construing the term in a prosecution

- 9 -

of criminal defendant for lewd and lascivious cohabitation);

Penrod v. Penrod, 29 Va. App. 96, 99-101, 510 S.E.2d 244, 245-46

(1999) (construing "cohabit" as intended in parties' PSA); Frey

v. Frey, 14 Va. App. 270, 275, 416 S.E.2d 40, 43 (1992) (also

construing cohabitation within intent of a PSA).  A body of law

of significant consistency which addresses the term's meaning

emerges from these cases and those decided in our sister states,[1]

particularly those addressing the issue in the context of

property settlement agreements.[2]  The following factors generally

have been considered relevant to the court's determination of

whether cohabitation has been proved.

1.  Common residence

The requirement that the payee ex-spouse and that party's

paramour be shown to have established and shared a common

residence is firmly established in Virginia case law.  See

Schweider, 243 Va. at 248-49, 415 S.E.2d at 137; Frey, 14

---

[1] See, e.g., Konzelman v. Konzelman, 729 A.2d 7, 16 (N.J. 1999) ("Cohabitation involves an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage.  They can include, but are not limited to, living together, intertwined finances such as joint bank accounts, sharing living expenses and household chores, and recognition of the relationship in the couple's social and family circle.").  See also Baker v. Baker, 566 N.W.2d 806 (N.D. 1997); Gordon v. Gordon, 675 A.2d 540 (Md. 1996); Iowa v. Kellogg, 542 N.W.2d 514 (Iowa 1996).

[2] The cases we cite in this opinion reflect the current status of a body of law which continues to evolve.  It is, therefore, not intended to be exclusive or definitive.

- 10 -

Va. App. at 275, 416 S.E.2d at 43 ("cohabitation, analogous to a marriage," means a status in which a man and woman live together continuously, or with some permanency, mutually assuming duties and obligations normally attendant with a marital relationship); see also Petachenko, 232 Va. at 299, 350 S.E.2d at 602. The shared common residence factor has been utilized as an element of the definition of cohabitation even before its use in property settlement agreements. See Johnson, 152 Va. at 970, 146 S.E. at 291 (cohabit means "to live together in the same house as married persons live together, or in the manner of husband and wife"). However, proof of a common or shared residence does not itself establish cohabitation. See Bergman, 25 Va. App. at 213, 487 S.E.2d at 267 (citing Schweider, 243 Va. at 248, 415 S.E.2d at 137; Frey, 14 Va. App. at 273, 416 S.E.2d at 42).

    2. Intimate or romantic involvement

An intimate relationship does not necessarily require sexual intimacy. See Penrod, 29 Va. App. at 101, 510 S.E.2d at 246 (a couple's sexual relationship alone is not a sufficient consideration in determining cohabitation). While sexual intimacy may provide significant proof of cohabitation, see Frey, 14 Va. App. at 275, 416 S.E.2d at 43, other indicia of a couple's close, interrelated functioning are equally important.

See Penrod, 29 Va. App. at 101, 510 S.E.2d at 246; see also Petachenko, 232 Va. at 299, 350 S.E.2d at 602.  "'[Cohabitation] . . . imports the . . . continuing condition of living together and carrying out the mutual responsibilities of the . . . relationship.'"  Schweider, 243 Va. at 248, 415 S.E.2d at 137 (quoting Petachenko, 232 Va. at 299, 350 S.E.2d at 602).  Compare Gordon v. Gordon, 675 A.2d 540, 547 (Md. 1996) ("[T]he ordinary definition of 'cohabitation,' describing a relationship of living together 'as man and wife,' connotes a mutual assumption of the duties and obligations associated with marriage.").

   3.  The provision of financial support

   Several decisions include receipt of financial contributions from the paramour to the payee ex-spouse as a factor to be considered.  See Schweider, 243 Va. at 248-49, 415 S.E.2d at 137; Frey, 14 Va. App. at 275, 416 S.E.2d at 4; see also Petachenko, 232 Va. at 299, 350 S.E.2d at 602.  "[Contributions] to financial support [by the paramour] . . . tend[ ] to prove the assumption of duties or obligations attendant to marriage . . . ."  Frey, 14 Va. App. at 275, 416 S.E.2d at 43.  See also Gordon, 675 A.2d at 548 (Maryland Court of Appeals found proof of shared assets and common bank accounts to be significant in determining cohabitation); cf. In the Matter of the Marriage of Winningstad, 784 P.2d 101, 104 (Ore.

- 12 -

App. 1989) (holding that without proof of such financial contribution, Oregon courts shall not terminate spousal support).

> 4. Duration and continuity of the relationship and other indicia of permanency

In Petachenko, the Virginia Supreme Court made clear that marital cohabitation "imports the continuing condition of living together."  232 Va. at 299, 350 S.E.2d at 602 (emphasis added); see also Colley v. Colley, 204 Va. 225, 228-29, 129 S.E.2d 630, 632 (1963).  No bright line test of duration has been established under our case law.  See, e.g., Penrod, 29 Va. App. at 98-101, 510 S.E.2d at 245-46 (dispositive evidence included intimate relationship of more than six years' duration between former wife and her paramour).[3]

In addition to specific measures of time, courts have examined other factors of a more circumstantial nature which evidence stability and permanency to determine whether cohabitation has been proved.  See, e.g., Gordon, 675 A.2d at 548 (community's view of couple's relationship held probative in determining cohabitation); Iowa v. Kellogg, 542 N.W.2d 514, 518 (Iowa 1996) (whether couple hold themselves out as "husband and

---

[3] In those cases where the parties' definition of the requisite time is clear, the PSA controls.  See Douglas, 28 Va. App. at 523, 507 S.E.2d at 101; Jones, 19 Va. App. at 268-69, 450 S.E.2d at 764; Tiffany, 1 Va. App. at 15, 332 S.E.2d at 799.

wife" is an element in determining cohabitation).[4]  Finally, the other factors to be applied in determining cohabitation, i.e. common residence, intimate or romantic involvement, and provision of financial support, may also be probative of the continuity and duration of a relationship.

We emphasize that, although the enunciated factors provide discrete categories of evidence relevant to the issue, no one factor is determinative.  See Penrod, 29 Va. App. at 101, 510 S.E.2d at 246 (a court's findings "must be based upon evidence concerning the overall nature of the relationship, not merely a piecemeal consideration of individual factors"); Frey, 14 Va. App. at 275, 416 S.E.2d at 43 (trial courts must not give any single factor dispositive effect); cf. Bergman, 25 Va. App. at 213, 487 S.E.2d at 267 ("cohabit" and "co-reside" are not synonymous, each having distinct elements and meanings).  Furthermore, it is within the province of the trial court to determine what weight to accord each of the factors relevant to the matter presented.  See Richardson v. Richardson, 242 Va. 242, 246, 409 S.E.2d 148, 151 (1991) (what weight to give the evidence is within the unique province of the trier of fact).

---

[4] See also Francis v. Francis, 72 Va. (31 Gratt.) 411 (1879).  Although not a case involving the issue of cohabitation in the context of divorce, the holding in Francis includes as relevant circumstantial evidence of cohabitation the "impression" of persons in the couple's immediate community that they were married.  See id. at 413.

Applying these principles to the instant case, we find the trial court did not err in determining that the evidence failed to prove cohabitation. The evidence, stated in the light most favorable to wife as the prevailing party, see Anderson v. Anderson, 29 Va. App. 673, 677, 514 S.E.2d 369, 372 (1999), established that wife has been romantically involved in an exclusive relationship with her paramour since 1989, that their relationship has been marked by sexual intimacy since 1990, that they have attended family functions together, that they have vacationed together, and that they have made frequent visits to each other's homes. Wife's paramour has established a close and familial relationship with the parties' daughters. However, the evidence failed to prove that wife shared a common residence with him or that they mutually assumed the duties and obligations normally associated with a marriage. Although wife's companion undertook some of the household chores while in her home, scant evidence proved that he financially contributed to or supported her household in any significant way. Evidence that he loaned money to wife and her children and that he and wife regularly exchanged gifts is insufficient to establish the degree of financial interdependence generally associated with marital relationships. Based on this record and the requisite standard of review, we cannot say the trial court improperly weighed the factors or that the evidence established

- 15 -

cohabitation as a matter of law.  See Konefal v. Konefal, 18 Va. App. 612, 614, 446 S.E.2d 153, 154 (1994).

V.

Husband's final claim on appeal challenges the trial court's award of attorney's fees to wife.  Specifically, he challenges the award of $5,000 for attorney's fees the wife expended in the successful defense of the husband's motion to terminate spousal support; $500 for the fees she incurred in the enforcement of the PSA in a rule to show cause proceeding; and $10,000 for fees incurred in her defense of an action brought by husband to set aside the final decree of divorce and its incorporated PSA on the ground of fraud.

The latter issue is res judicata.  In an earlier appeal, the award of $10,000 attorney's fees was determined appropriate under, and consistent with, the PSA's provision governing such awards.  See Pellegrin v. Pellegrin, No. 0765-98-4 (Va. Ct. App. Nov. 24, 1998) (rehearing denied, Va. Ct. App. Jan. 4, 1999) (petition for appeal filed in the Supreme Court, Jan. 25, 1999). The remaining claims with respect to the award of attorney's fees are controlled by the language of the PSA, which states:

> The parties agree that any expenses, including but not limited to, counsel fees, court costs, and travel, incurred by a party in the successful enforcement of any of the provisions of this Agreement, whether through litigation or other action necessary to compel compliance herewith, shall be borne by the defaulting party.  Any such

- 16 -

costs incurred by a party in the successful
defense to any action for enforcement of any
such provisions shall be borne by the party
seeking to enforce compliance.

The award of attorney's fees is normally within the discretion of the trial court.  See Graves v. Graves, 4 Va. App. 326, 333, 357 S.E.2d 554, 558 (1987).  We find that the actions for which attorney's fees were awarded involved the successful enforcement of the PSA and that the court did not err in making its award.

For the reasons stated in this opinion, we affirm in part, and reverse and remand in part, the decision of the trial court.

Affirmed in part,
reversed and
remanded in part.