COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges McCullough and Huff
Argued at Alexandria, Virginia


SHEILA E. BRENNAN
                                                MEMORANDUM OPINION[*] BY
v.        Record No. 2042-11-4               JUDGE STEPHEN R. McCULLOUGH
                                                      JULY 24, 2012
PAUL D. ALBERTSON


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
J. Howe Brown, Judge Designate

Jacob Alzamora (Solan Alzamora, PLLC, on briefs), for appellant.

Paul D. Albertson, *pro se.*


The Circuit Court of Fairfax County concluded that Sheila E. Brennan was "habitually

cohabiting with another person in a relationship analogous to a marriage" pursuant to Code

§ 20-109(A) and, therefore, the trial court granted husband's motion to terminate his obligation to

pay spousal support. She assigns error to this ruling, contending that (1) the trial court

"misinterpreted the term 'relationship analogous to a marriage' to include a non-sexual, non-

romantic friendship between two roommates," and (2) "the trial court erred by misapplying two of

the four factors outlined in Pellegrin [v. Pellegrin, 31 Va. App. 753, 525 S.E.2d 611 (2000)]." We

find no error and, therefore, we affirm the judgment of the trial court.

BACKGROUND

Brennan and her former husband, Paul D. Albertson, were divorced in 2007. The final

decree of divorce required Albertson to pay spousal support through June 1, 2019. On April 15,

2011, he filed a motion to terminate his spousal support obligation, alleging that Brennan was

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

involved in a romantic relationship with another woman and that their relationship was analogous to a marriage.

The evidence established that Brennan and Lisa Baker met in February 2006 at an Alcoholics Anonymous meeting. They became close friends, and Baker agreed to serve as Brennan's sponsor. In April of 2006, the two spent the weekend together at the Wintergreen resort playing golf. That same year, Baker and Brennan played golf together on Mother's Day. Baker moved in with Brennan in November of 2007.

Initially, Baker signed a lease, which provided that Baker would pay Brennan monthly rent in the amount of $1,500. Brennan did not recall whether Baker ever made any payments under the lease. In January of 2008, Brennan purchased a house for $859,000. She did not receive any financial assistance from Baker in buying the property. Brennan made a down payment on this house in the amount of $470,000.

Baker immediately moved into the new home with Brennan. By deed of gift, Brennan made Baker a joint tenant with the right of survivorship. Brennan explained that she executed the deed of gift so that, in the event of her premature death, Baker would provide for Brennan's children. No agreement, however, obligates Baker to provide for Brennan's children. Instead, the arrangement is rooted in mutual trust. Baker took over the mortgage payment shortly after Brennan purchased the house. The mortgage payment is $3,169 per month. Initially, Baker occupied the basement, but later moved her room to the master bedroom upstairs. Brennan occupies her own separate bedroom upstairs.

Baker pays the electric and water bills and also carries on her cellular telephone plan Brennan's cell phone, as well as cell phones used by Brennan's children Maggee and T.J. Brennan has paid for some "big ticket" items such as an expensive landscaping bill for tree removal. Neither

Baker nor Brennan keep an accounting of the various expenditures made for the benefit of the household.

Baker and Brennan maintain separate bank, credit card, and investment accounts, and neither has access to the other's accounts. The children, rather than Baker, are the beneficiaries of Brennan's life insurance policy. Brennan's and Baker's vehicles are separately titled.

With regard to the household's social life, Brennan and Baker dine together, along with the children. Baker and Brennan share chores, such as laundry and cooking. Baker attended two of Brennan's family reunions, in 2009 and 2010. Brennan also visited Baker's family in Ohio. Baker and Brennan occasionally attend church together. Brennan and Baker have vacationed together every year, along with their children.

Brennan and Baker's lives are closely intertwined with respect to childcare. Brennan's three children, Maggee, T.J., and Matthew, live with Brennan and Baker. In January of 2008, Baker gave birth to a daughter, Riley. Brennan was present at Riley's birth. From the time of Riley's birth, Brennan has taken care of Riley, along with her own children, while Baker is at work. This arrangement allowed Brennan to care for Matthew, who was nine at the time and who needed extra attention because he suffers from Asperger's syndrome. Baker does not pay Brennan for providing childcare. Brennan and Baker have attended school functions and events of each other's children. Brennan has bought a variety of items for Riley.

Baker and Brennan both denied having a romantic relationship with each other. Brennan testified that Baker is "like a sister to me." Baker said that Brennan is "a very good friend" and "[s]he is like a sister that I never had." Maggee testified that Baker and her mother are like "best friends" or "sisters." Neither Baker nor Brennan have been involved in a romantic relationship with anyone since they have been living together.

At the conclusion of the hearing, the court found that "there is no evidence in this case of a sexual relationship." The court reviewed the evidence and concluded that Brennan and Baker were "intimately intertwined" and found "by clear and convincing evidence that there has been cohabitation analogous to marriage for a period of a year." The court ordered the termination of Albertson's support obligation. Brennan appeals from this ruling.

ANALYSIS

Code § 20-109(A) provides in relevant part that

> [u]pon order of the court based upon clear and convincing evidence that the spouse receiving support has been habitually cohabiting with another person in a relationship analogous to a marriage for one year or more commencing on or after July 1, 1997, the court shall terminate spousal support and maintenance unless (i) otherwise provided by stipulation or contract or (ii) the spouse receiving support proves by a preponderance of the evidence that termination of such support would be unconscionable.

In reviewing the decision of the trial court, "we view the evidence in the light most favorable to . . . the party prevailing below, 'and grant all reasonable inferences fairly deducible therefrom.'" Johnson v. Johnson, 56 Va. App. 511, 513-14, 694 S.E.2d 797, 799 (2010) (quoting Anderson v. Anderson, 29 Va. App. 673, 678, 514 S.E.2d 369, 372 (1999)). We review questions of law, including questions of statutory construction, *de novo*. Louis Latour, Inc. v. Va. Alcoholic Bev. Contr. Bd., 49 Va. App. 758, 766, 645 S.E.2d 318, 322 (2007).

I. THE TRIAL COURT PROPERLY CONCLUDED ON THIS EVIDENCE THAT BRENNAN WAS HABITUALLY COHABITING WITH ANOTHER PERSON IN A RELATIONSHIP ANALOGOUS TO MARRIAGE.

The trial court found no evidence of sexual intimacy between Brennan and Baker, but concluded that this relationship nevertheless was analogous to marriage. Brennan argues that without romance or a sexual intimacy, her relationship with Baker cannot be a relationship that is "analogous to a marriage."

- 4 -

In resolving this question, "[w]e look to the plain meaning of the statutory language, and presume that the legislature chose, with care, the words it used when it enacted the relevant statute." Addison v. Jurgelsky, 281 Va. 205, 208, 704 S.E.2d 402, 404 (2011) (internal citations and quotation marks omitted). The General Assembly did not require a relationship to be *identical* to marriage. Instead, the legislature employed the term "analogous" to marriage. Code § 20-109(A). "Analogous" is commonly understood to mean "susceptible of comparison either in general or in some specific detail" or "having a similar function but differing in structure and origin." Webster's Third New International Dictionary 76 (1981). In Stroud v. Stroud, 49 Va. App. 359, 378, 641 S.E.2d 142, 151 (2007), we defined "analogous" as "similar in some way" or "one thing that has a resemblance in many respects, nearly corresponds, is somewhat like, or has a general likeness to some other thing but is not identical in form and substance." Of course, sexual intimacy and romance are highly relevant in determining whether two persons are cohabiting in a relationship analogous to a marriage. The General Assembly, however, did not make romance or sexual intimacy dispositive, and we are bound by that choice.

Applicable cases support this conclusion. In Petachenko v. Petachenko, 232 Va. 296, 299, 350 S.E.2d 600, 602 (1986) (emphasis added and citations omitted), the Supreme Court of Virginia observed that

> [a] mere denial of sexual intercourse, where other marital duties are performed, does not constitute desertion . . . . Conversely, in order to end a desertion, the parties must resume the matrimonial cohabitation with the intent to end the desertion. Not only is resumption of sexual relations *a factor* the parties also must resume the performance of marital duties while living together on a continuous basis.

Similarly here, the absence of sexual intimacy or romance does not categorically preclude a finding of a relationship analogous to marriage. In determining whether two persons were cohabiting, we stated in Pellegrin that "[a]n intimate relationship does not necessarily require

- 5 -

sexual intimacy" and that "other indicia of a couple's close, interrelated functioning are equally important." Pellegrin, 31 Va. App. at 764, 525 S.E.2d at 616. We further emphasized "no one factor is determinative" and "[i]t is within the province of the trial court to determine what weight to accord each of the factors relevant to the matter presented." Id. at 766, 525 S.E.2d at 617. See also Penrod v. Penrod, 29 Va. App. 96, 101, 510 S.E.2d 244, 246 (1999) ("A finding of 'cohabitation' must be based upon evidence concerning the overall nature of the relationship, not merely a piecemeal consideration of individual factors such as its sexual or financial components.").

Having resolved that romantic attachment and sexual intimacy are not absolute prerequisites for a finding of cohabitation and a relationship analogous to marriage, we proceed to determine whether the evidence supports the trial court's finding that Baker and Brennan were "cohabiting with another person in a relationship analogous to a marriage." The terms "cohabitating" and a relationship "analogous to marriage" overlap to a large degree. The Supreme Court of Virginia has defined the term "cohabit" as "'liv[ing] together in the same house as married persons live together, or in the manner of husband and wife.'" Schweider v. Schweider, 243 Va. 245, 248, 415 S.E.2d 135, 137 (1992) (quoting Johnson v. Commonwealth, 152 Va. 965, 970, 146 S.E. 289, 291 (1929)). In Frey v. Frey, 14 Va. App. 270, 275, 416 S.E.2d 40, 43 (1992), we explained that the phrase "cohabitation, analogous to a marriage" used in a property settlement agreement means "a status in which [two persons] live together continuously, or with some permanency, mutually assuming duties and obligations normally attendant with a marital relationship."

A threshold requirement for a finding of cohabitation is that the former spouse and another person actually share a common residence. Cranwell v. Cranwell, 59 Va. App. 155, 163, 717 S.E.2d 797, 800 (2011). Unquestionably, that requirement is met here. Brennan and Baker

have shared a common residence since 2007. Once this initial question is answered, additional factors relevant to the cohabitation inquiry include intimate or romantic involvement, the provision of financial support, and the duration and continuity of the relationship and other indicia of permanency. Pellegrin, 31 Va. App. at 764-66, 525 S.E.2d at 616-17. We cautioned in Pellegrin that "although the enunciated factors provide discrete categories of evidence relevant to the issue, no one factor is determinative . . . it is within the province of the trial court to determine what weight to accord each of the factors relevant to the matter presented." Id. at 766, 525 S.E.2d at 617.

Similar factors govern the analysis of whether a relationship is one analogous to a marriage. Cf. Frey, 14 Va. App. at 273-76, 416 S.E.2d at 42-44 (construing the phrase "cohabitation, analogous to a marriage" in a property settlement agreement); Stroud, 49 Va. App. at 373-77, 641 S.E.2d at 148-50 (construing the phrase "cohabitation with any person . . . in a situation analogous to marriage" in a property settlement agreement).

Brennan and Baker shared a residence for a period of years. They regarded this arrangement as permanent or indefinite. They were interdependent financially and with respect to childcare. Brennan executed a deed of gift to make Baker a joint owner of the home in which she held considerable equity. She did this freely, trusting that Baker would care for her children in the event of Brennan's death. Baker paid Brennan's mortgage from the time they moved into this house and also paid the electric, water, and cellular telephone bills for Brennan and her children. Brennan was present at the birth of Baker's daughter Riley and provided childcare for Baker from the time of Riley's birth. Beyond childcare, Brennan and Baker functioned as a family unit: they routinely shared meals, vacationed together every year, attended each other's family reunions, occasionally attended church together, and attended the activities of each other's children. Brennan and Baker shared household chores, such as cooking and laundry.

Brennan and Baker's relationship resists characterization as "roommates" or a "mere friendship," Appellant's Br. at 4. Based on the totality of this evidence, the trial court could find their relationship is analogous to marriage for purposes of Code § 20-109(A).[1]

Appellant argues that this conclusion would open a "potential floodgate of cases" involving "close friends, parents and children, siblings, and cousins." Appellant's Br. at 6. We find this argument unpersuasive. An affectionate relationship between siblings or between parents and children differs intrinsically from a "relationship analogous to a marriage" between unrelated persons. Moreover, it will be the rare case where friendly roommates will achieve a relationship like the one shown here. Brennan and Baker have lived under the same roof for a period of years, are greatly interdependent with respect to childcare and financial matters, have formed close and lasting social and emotional bonds, and have manifested an uncommon degree of mutual trust.

## II. THE TRIAL COURT CORRECTLY APPLIED OUR PELLEGRIN DECISION.

Brennan argues that the trial court erred in applying two of the factors mentioned in Pellegrin. First, Brennan contends, the trial court "effectively eliminate[d] the factor requiring a romantic or intimate relationship." Second, Brennan asserts, the trial court "misinterprete[d] the factor requiring the receipt of financial support."

Brennan's first argument is that one factor – sexual intimacy or romance *is* determinative. As we note above, a romantic or sexual relationship is not a prerequisite for a finding of cohabitation in a relationship analogous to a marriage. Moreover, Pellegrin establishes that "no one factor is determinative" in establishing cohabitation. Id. at 766, 525 S.E.2d at 617. This

---

[1] Our holding does not, indeed could not, impart any legal status to the relationship between Brennan and Baker. It simply applies Code § 20-109(A), following the lawful dissolution of Brennan's and Albertson's marriage, to determine whether monthly support from Brennan's former spouse should be discontinued.

Court observed that "[a]n intimate relationship does not necessarily require sexual intimacy" and that "[w]hile sexual intimacy may provide significant proof of cohabitation . . . other indicia of a couple's close, interrelated functioning are equally important." Id. at 764, 525 S.E.2d at 616.

This conclusion, that romance or sexual intimacy is not a precondition for a relationship analogous to a marriage, effectively resolves Brennan's second argument. Brennan argues that the trial court misapplied the Pellegrin factor regarding financial support. In Brennan's view, "it is not the sharing of expenses which is described in Pellegrin as a factor of a relationship analogous to marriage, but much more specifically '[contributions] to financial support [by the paramour].'" Appellant's Br. at 8 (quoting Pellegrin, 31 Va. App. at 765, 525 S.E.2d at 617). Brennan reads Pellegrin too narrowly. This Court in Pellegrin found significant the "provision of financial support" in determining whether parties were cohabiting. Examples of such financial support include whether a "paramour" contributed financially to the "payee ex-spouse" as well as the presence of "shared assets and common bank accounts." Id. Where two persons have engaged in the "provision of financial support," that circumstance is relevant to determining the presence of cohabitation and a relationship analogous to a marriage. The contributions can and often will come from a "paramour" but, as we conclude, the cohabiting persons need not be romantically involved or sexually intimate.

The dissent raises an issue *sua sponte* that is not raised in the assignments of error and that has never been briefed below or in this Court, namely, whether a same sex relationship can qualify as "cohabitat[ion] with another person in a relationship analogous to a marriage" under Code § 20-109(A). On the merits of that question, the dissent may well be correct. The assignments of error, however, do not raise this question. These assignments of error frame and restrict the issue we address. See Yeatts v. Murray, 249 Va. 285, 290, 455 S.E.2d 18, 21 (1995) ("'The purpose of assignments of error is to point out the errors . . . on which appellant intends to

- 9 -

ask a reversal of the judgment, *and to limit discussion to these points.*'" (emphasis added) (quoting <u>Harlow v. Commonwealth</u>, 195 Va. 269, 271-72, 77 S.E.2d 851, 853 (1953))). Moreover, the cases the dissent cites do not address that question. Because the issue is not before us, nothing in this opinion should be construed as supporting or opposing a conclusion that Code § 20-109(A) applies or does not apply to same sex relationships. We simply decline to address the issue *sua sponte*.

CONCLUSION

We affirm the decision of the trial court that Brennan and Baker were cohabiting in a relationship analogous to marriage and, therefore, the trial court did not err in granting Albertson's motion to terminate the previously ordered spousal support.

<u>Affirmed.</u>

Felton, C.J., dissenting.

Under the circumstances presented in the record on appeal, I would reverse the trial court's order terminating Albertson's monthly spousal support payments to Brennan, and hold that the trial court erred, as a matter of law, by finding that Brennan was "in a relationship analogous to a marriage" with Baker, pursuant to Code § 20-109(A).

An issue of statutory interpretation is a pure question of law which we review *de novo*. Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007). "As with any question of statutory interpretation, our primary objective is 'to ascertain and give effect to legislative intent,' as expressed by the language used in the statute." Ruby v. Cashnet, Inc., 281 Va. 604, 609, 708 S.E.2d 871, 873-74 (2011) (quoting Commonwealth v. Amerson, 281 Va. 414, 418, 706 S.E.2d 879, 882 (2011)).

On July 20, 2007, the circuit court entered a final decree of divorce between the parties and ordered Albertson to pay monthly spousal support to Brennan for a period of twelve years. In April 2011, Albertson filed a motion to terminate his obligation to pay spousal support pursuant to paragraph five of the final decree of divorce, which provided that support shall be terminated "based upon clear and convincing evidence that [Brennan] has been habitually cohabiting with another person in a relationship analogous to a marriage for one year or more." Code § 20-109(A). On September 9, 2011, the circuit court entered an order terminating Albertson's obligation to pay spousal support to Brennan, finding that Brennan's relationship with Baker, a woman with whom she resided, was "a relationship analogous to a marriage" pursuant to Code § 20-109(A). In her first assignment of error, Brennan contends that the trial court erred by interpreting the phrase "relationship analogous to a marriage" under Code § 20-109(A) to include "a non-sexual, non-romantic friendship between two roommates."

Prior to 1997, Code § 20-109 designated only two events, remarriage and death, as occurrences sufficient to terminate spousal support. See, e.g., Acts of Assembly, ch. 518 (1994). In 1997, the General Assembly amended and reenacted Code § 20-109(A) to include cohabitation as a termination event:

> Upon order of the court based upon clear and convincing evidence that the spouse receiving support has been habitually *cohabiting with another person in a relationship analogous to a marriage* for one year or more . . . the court may decrease or terminate spousal support and maintenance unless (i) otherwise provided by stipulation or contract or (ii) the spouse receiving support proves by a preponderance of the evidence that termination of such support would constitute a manifest injustice.

Acts of Assembly, ch. 241 (1997) (emphasis added).[2]

In 1992, five years prior to the General Assembly's amendment to Code § 20-109(A), the Supreme Court held that "cohabit" meant "'to live together in the same house as married persons live together, or in the manner of *husband and wife*.'" Schweider v. Schweider, 243 Va. 245, 248, 415 S.E.2d 135, 137 (1992) (construing the phrase "wife's permanent cohabitation with a male as if to all appearances they were otherwise married" in a property settlement agreement) (emphasis added) (quoting Johnson v. Commonwealth, 152 Va. 965, 970, 146 S.E. 289, 291 (1929)).

In the same year that the Supreme Court decided Schweider, this Court held that "cohabitation, analogous to a marriage" "mean[t] a status in which *a man and woman* live together continuously, or with some permanency, mutually assuming duties and obligations normally attendant with a marital relationship." Frey v. Frey, 14 Va. App. 270, 275, 416 S.E.2d 40, 43 (1992) (construing a property settlement agreement) (emphasis added).

In Frey, we noted that:

> Courts in other jurisdictions also have interpreted similar language in property settlement agreements and have generally concluded that it

---

[2] The Code does not separately define the phrase "relationship analogous to a marriage."

has a precise legal meaning. . . . The Oregon Court of Appeals said that "cohabitation" as used in the phrase, "cohabitation with a member of the opposite sex," means "a domestic arrangement *between a man and a woman* who are not married to each other, but who live as husband and wife, in that, for more than a brief period of time, they share a common domicile and living expenses and are sexually intimate."[3] Marriage of Edwards, 698 P.2d 542, 547 (1985). . . . The Pennsylvania Superior Court construed the term, "cohabitation," as used in a statute delineating the conditions that justified the termination of spousal support, as requiring a finding that two individuals "reside together in *the manner of husband and wife*, mutually assuming those rights and duties usually attendant upon the marital relationship." Miller v. Miller, 508 A.2d 550, 554 (1986). "Cohabitation" as defined in Black's Law Dictionary is "to live together as *husband and wife*. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but [not] necessarily dependent upon sexual relations." Black's Law Dictionary 260 (6th ed. 1990).

Id. at 273-74, 416 S.E.2d at 42-43 (emphases and footnote added).

Prior to the General Assembly's amendment and reenactment of Code § 20-109(A) to include the phrase "cohabitating . . . in a relationship analogous to marriage," the legislature understood "the common-law background and origin of the [phrase]." 2B Sutherland, Statutes and Statutory Construction § 50:3, at 179 (Norman J. Singer ed., 7th ed. 2008). As this Court held in Bagley v. City of Richmond Dep't of Soc. Servs., 59 Va. App. 522, 525, 721 S.E.2d 21, 23 (2012):

> When a statute uses words having an established common law meaning, courts presume the legislature intended that meaning unless the statute clearly suggests otherwise. Microsoft Corp. v. i4i Ltd. P'ship, 131 S. Ct. 2238, 2245 (2011). When a Virginia statute "employs a word or phrase which has already been used in the common law or in another statute, and has there acquired by construction an established meaning, it is to be understood in the meaning previously determined." Houston v. Commonwealth, 87 Va. 257, 262, 12 S.E. 385, 386 (1890). This canon of construction

---

[3] The 1997 amendment to Code § 20-109(A), as originally introduced in the House of Delegates, read: "Upon the death, *cohabitation with a person of the opposite sex*, or remarriage of the spouse receiving support, spousal support shall terminate unless otherwise provided by stipulation or contract." H.B. 1341, Reg. Sess. (Jan. 22, 1996). The language of H.B. 1341, as enacted, was proposed by the Senate Committee for Courts of Justice on February 10, 1997. H.B. 1341, Reg. Sess. (Feb. 10, 1997).

presumes the legislature "knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." Beck v. Prupis, 529 U.S. 494, 501 (2000) (quoting Morissette v. United States, 342 U.S. 246, 263 (1952)).

(Footnote omitted).

Here, we may presume the General Assembly intended that the 1997 amendment to Code § 20-109(A), including the phrase "cohabiting with another person in a relationship analogous to a marriage," would "be understood in the meaning previously determined" by the Virginia courts. Houston, 87 Va. at 262, 12 S.E. at 386. That is, we may presume the legislature intended that "cohabiting with another person in a relationship analogous to marriage" under Code § 20-109(A) would mean "a status in which a *man and woman* live together continuously, . . . mutually assuming duties and obligations normally attendant with a marital relationship." Frey, 14 Va. App. at 275, 416 S.E.2d at 43. Indeed, neither this Court nor the Supreme Court has ever expressly held that the cohabitation principle expressed in Code § 20-109(A) applies to same-sex unions, whether or not those unions are characterized by sexual or physical intimacy.[4]

In my view, the General Assembly intended only cohabitation between a man and a woman to qualify as "a relationship analogous to a marriage" under Code § 20-109(A). Accordingly, I

---

[4] As recently as 2011, we affirmed that "habitually cohabiting with another person in a relationship analogous to a marriage" under Code § 20-109(A) "'mean[t] a status in which *a man and woman* live together continuously, or with some permanency, mutually assuming duties and obligations normally attendant with a marital relationship.'" Cranwell v. Cranwell, 59 Va. App. 155, 161, 717 S.E.2d 797, 800 (2011) (emphasis added) (quoting Frey, 14 Va. App. at 275, 416 S.E.2d at 43).

In Stroud v. Stroud, 49 Va. App. 359, 641 S.E.2d 142 (2007), we held that "the trial court erred in concluding that, *for the purposes of interpreting the contract between husband and wife*, same sex individuals may not cohabit in Virginia as a matter of law." Id. at 379, 641 S.E.2d at 151 (emphasis added). However, in interpreting husband's and wife's property settlement agreement, we explicitly stated that our reasoning would not necessarily apply to the statutory analysis: "[I]n this case we are concerned with a contract between a man and a woman, husband and wife, *not a statute defining or to be interpreted as defining 'cohabitation'* . . . ." Id. at 377, 641 S.E.2d at 151 (emphasis added).

would hold the trial court erred as a matter of law in terminating Albertson's obligation to pay court-ordered spousal support to Brennan because she "[was] in a relationship analogous to a marriage" with Baker, another woman.

I respectfully dissent.