COURT OF APPEALS OF VIRGINIA


Present:   Judges Beales, Alston and Senior Judge Annunziata
Argued at Alexandria, Virginia


MARY C. SCHUMAN

                                                    MEMORANDUM OPINION[*] BY
v.        Record Nos. 0631-09-4, 1259-09-4 and      JUDGE ROSEMARIE ANNUNZIATA
                  1260-09-4                                APRIL 20, 2010

DANIEL C. SCHUMAN


              FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                        Gaylord L. Finch, Jr., Judge

          William B. Reichhardt (Colleen C. Sweeney; William B. Reichhardt &
          Associates, on briefs), for appellant.

          Scott A. Surovell (Jason E. Braun; Surovell Markle Isaacs & Levy,
          PLC, on brief), for appellee.


        Mary C. Schuman (wife) appeals the trial court's ruling incorporating a premarital

agreement into an order and its rulings in the subsequent equitable distribution hearing.  Wife argues

that the trial court erred by (1) incorporating the parties' premarital agreement (the Agreement)

pursuant to Code § 20-109.1 because the Agreement was not a valid contract and was a contract in

contemplation of divorce under Virginia law; (2) applying the Agreement to the distribution of the

parties' property where the parties' express intent was that it apply only upon their death and only

upon proper evidence of each party's contribution to the property; (3) failing to properly classify

and value property, to apply the burden of proof in the tracing of assets, and to consider all the

factors in Code § 20-107.3; (4) determining the lease entered into by the parties was valid; and

(5) ordering the transfer of the Sarasota condominium to husband in contradiction to Code

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

§ 20-107.3 and the parties' Agreement.  Daniel C. Schuman (husband) presents three issues of cross-error:  the trial court erred (1) in awarding wife a separate interest in the Arlington condominium; (2) in classifying certain property as wife's separate property; and (3) by failing to consider monies wife removed from husband's bank account.  We affirm the trial court's decision in part, reverse in part, and remand this case to the trial court for further proceedings consistent with this opinion.

BACKGROUND

"When reviewing a trial court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences."  Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 834 (2003) (citations omitted).

So viewed, the evidence showed that the parties met on June 26, 2003.  At that time, wife lived in a home known as Fiddler's Green with her son.  She purchased the home in 1989.  Within a couple of months, husband moved into Fiddler's Green, and the parties agreed to make renovations to the home.  In September 2003, husband presented wife with a premarital agreement, which wife refused to execute.  On March 12, 2004, husband purchased a condominium in Sarasota, Florida, which was titled as a joint tenancy with the right of survivorship.  In May 2004, husband presented wife with a lease permitting him to occupy Fiddler's Green for forty years.  The parties signed the lease on May 16, 2004.  The parties signed a premarital agreement on June 23, 2004, after exchanging and rejecting several earlier drafts of the agreement.  The executed Agreement reconfirmed the lease and, among other matters, discussed the distribution of Fiddler's Green and the Sarasota condominium.

The parties married on June 26, 2004.  During the marriage, the parties made renovations to Fiddler's Green and paid off the mortgage on the home.  The parties had two jointly titled bank accounts; wife primarily used one account, and husband primarily used the other.

- 2 -

On August 20, 2007, the parties separated, and wife filed a complaint for divorce on August 24, 2007. Prior to the entry of the final divorce decree, husband sought to incorporate the Agreement into an order and apply it to the distribution of some of the parties' property. Wife objected and argued that the Agreement's ambiguity precluded its incorporation into the divorce decree. After initially concluding the Agreement was ambiguous with respect to the parties' intent and taking evidence, including parol evidence, the trial court ultimately granted husband's motion to incorporate the Agreement, basing its ruling on the "plain language of the agreement":

> In this case, the plain language of the agreement on page 6 specifically provides that both parties have agreed that the court of relevant jurisdiction shall be requested by both parties to incorporate the agreement in any decree or judgment in the event of a divorce or separation action by either of the parties.
>
> By the language, it is clear to the court that the terms of this agreement were intended to apply not only in the event of the deaths of the parties, but also in the event that the marriage was dissolved.

The court then addressed wife's argument that the Agreement's terms were too indefinite to be enforceable. The trial court disagreed, noting:

> Having decided that threshold question, the next issue to be decided is whether the agreement is enforceable or unenforceable, because its terms are too indefinite or vague.
>
> This court does find that some of the terms are ambiguous. However, any ambiguity has been clarified by the evidence presented and the testimony of the parties.[1]

The court did not state the basis of its finding that "some of the terms are ambiguous," nor did it identify the terms the court found ambiguous or the testimony upon which it relied that clarified their meaning.

---

[1] The Agreement was incorporated into a separate order on October 17, 2008.

In December 2008 and January 2009, the trial court conducted a four-day equitable distribution hearing and again held that the Agreement was valid and enforceable.[2]  It distributed the parties' property in accordance with the equitable distribution principles of Code § 20-107.3, except for Fiddler's Green and the Sarasota condominium.  These two real property assets were distributed pursuant to the terms of the Agreement.  Both parties filed motions for reconsideration, which the trial court denied.  These appeals followed.

ANALYSIS

I.

DID THE TRIAL COURT ERR BY INCORPORATING THE AGREEMENT BECAUSE THE AGREEMENT WAS NOT A VALID AGREEMENT AND WAS ENTERED IN CONTEMPLATION OF DIVORCE?

Wife argues the Agreement is not valid based on three grounds:  1) it is ambiguous and therefore not enforceable, 2) it is unconscionable, and 3) it was entered in contemplation of divorce.  Wife failed to preserve two of her three grounds.  We address the defaulted grounds first.

Pursuant to Rule 5:18, we will not consider on appeal wife's argument that the Agreement is unconscionable because she did not present it to the trial court.  Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998).  "The purpose of Rule 5A:18 is to allow the trial court to correct in the trial court any error that is called to its

------

[2] A different judge conducted the equitable distribution hearing and issued a letter opinion addressing the question:

> Although there were other provisions in which "divorce" was referenced, specifically one providing that the parties would pay their own attorney's fees incurred in conjunction with a divorce, . . . the trial judge squarely based her decision that there was no ambiguity in the provisions requesting the agreement be incorporated.

- 4 -

attention." Lee v. Lee, 12 Va. App. 512, 514, 404 S.E.2d 736, 737 (1991) (en banc). Therefore, Rule 5A:18 prevents us from considering this argument.

> Although Rule 5A:18 allows exceptions for good cause or to meet the ends of justice, appellant does not argue that we should invoke these exceptions. See e.g., Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) ("In order to avail oneself of the exception, a *defendant must affirmatively show* that a miscarriage of justice has occurred, not that a miscarriage might have occurred." (emphasis added)). We will not consider, *sua sponte*, a "miscarriage of justice" argument under Rule 5A:18.

Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (*en banc*). Moreover, the record does not reflect any reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

Pursuant to Rules 5A:18 and 5A:20(e), we will not consider wife's argument on appeal that the Agreement was entered in contemplation of divorce because it was neither presented to the trial court nor addressed on brief. Jay v. Commonwealth, 275 Va. 510, 520, 659 S.E.2d 311, 317 (2008). See also Klein v. Klein, 49 Va. App. 478, 482, 642 S.E.2d 313, 315-16 (2007).

With respect to wife's remaining ground, we find that the trial court did not err in finding that the plain language of the Agreement required that it be incorporated into the divorce decree.[3]

"Antenuptial agreements, like marital property settlements, are contracts subject to the rules of construction applicable to contracts generally, including the application of the plain meaning of unambiguous contractual terms." Pysell v. Keck, 263 Va. 457, 460, 559 S.E.2d 677, 678 (2002) (citing Southerland v. Estate of Southerland, 249 Va. 584, 588, 457 S.E.2d 375, 378 (1995)). See also Plunkett v. Plunkett, 271 Va. 162, 166-67, 624 S.E.2d 39, 41 (2006).

---

[3] The Agreement stated, "In the event of any divorce or separation action by either of us, we both agree that the court of relevant jurisdiction shall be requested by both of us to incorporate this Agreement in any decree or judgment in any such action, but not merged."

"Contract language is ambiguous when 'it may be understood in more than one way or when it refers to two or more things at the same time.'" Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 632, 561 S.E.2d 663, 668 (2002) (quoting Granite State Ins. Co. v. Bottoms, 243 Va. 228, 234, 415 S.E.2d 131, 134 (1992)). But, "if no patent or latent ambiguities exist, a court should enforce the plain meaning of the contractual language without resort to extrinsic evidence." Smith v. Smith, 43 Va. App. 279, 287, 597 S.E.2d 250, 254 (2004) (citing Eure, 263 Va. at 632, 561 S.E.2d at 667; King v. King, 40 Va. App. 200, 206, 578 S.E.2d 806, 810 (2003)).

Whether contract language is ambiguous is a question of law, not fact. Tuomala v. Regent Univ., 252 Va. 368, 374, 477 S.E.2d 501, 505 (1996). The trial court's ruling is, thus, subject to *de novo* review. Eure, 263 Va. at 631, 561 S.E.2d at 667 ("we have an equal opportunity to consider the words of the contract within the four corners of the instrument itself" (citing Wilson v. Holyfield, 227 Va. 184, 187-88, 313 S.E.2d 396, 398 (1984))). Under that review, no deference is accorded the trial court's conclusion regarding ambiguity. Plunkett, 271 Va. at 167, 624 S.E.2d at 41 (citing Tuomala, 252 Va. at 374, 477 S.E.2d at 505).

In considering whether the Agreement was to be incorporated into the divorce decree, the trial judge who first decided the question found the language of incorporation "plainly" required that the Agreement was to be incorporated into the decree, implicitly concluding there was no ambiguity. The judge next assigned to the case, and who conducted the equitable distribution hearing, concurred in the finding that the Agreement was not ambiguous and that the clear language of the incorporation provision required that it be incorporated into the decree of divorce:

> [The predecessor judge] found that there was no ambiguity in the premarital agreement and she incorporated the agreement into the Final Decree of Divorce. . . .

- 6 -

> [T]he Plaintiff [wife] continues to argue that the Premarital
> Agreement was only enforceable upon death of one of the parties.
> However, the Premarital Agreement clearly states:
>
> "In the event of any divorce or separation action by either of us, we
> both agree that the court of the relevant jurisdiction shall be
> requested by both of us to incorporate this Agreement in any
> decree of judgment in any such action, but not merged."
>
> This Court finds no basis not to follow [the predecessor judge's]
> ruling and thus finds that the Premarital Agreement was
> incorporated.

We find no error in the trial court's decision to incorporate the Agreement into the divorce decree based on the plain language of the Agreement.

## II.

### DID THE COURT ERR IN APPLYING THE PREMARITAL AGREEMENT TO THE DISTRIBUTION OF PROPERTY CONTRARY TO THE INTENT OF THE PARTIES?

Wife contends that the trial court erred in applying the Agreement to the distribution of property, specifically to the distribution of Fiddler's Green and the Sarasota condominium, on the ground that the parties did not intend the Agreement to apply in the context of divorce. We agree.

The trial court's ruling that the parties intended that the Agreement be incorporated into any divorce proceeding that might ultimately ensue and that they plainly expressed that intent in one of the Agreement's provisions does not address the core issue wife raises before this Court. The core issue is whether the provisions so incorporated govern the disposition of the parties' real property known as Fiddler's Green and the Sarasota condominium, or whether they, like the remaining provisions in the Agreement and as the trial court concluded, apply only upon the death of the parties. We find that although the trial court did not err in incorporating the Agreement into the divorce decree, it erred in concluding the parties intended that the Agreement

- 7 -

was to govern the distribution of Fiddler's Green and the Sarasota condominium in the context of divorce. Its award on this issue must, accordingly, be reversed.

The Agreement consists of seven pages and numerous provisions of which only three reference divorce: one directing the Agreement be incorporated into any divorce decree, one directing the parties' individual responsibility for the payment of attorney's fees in the event of separation or divorce, and one providing for a determination of the parties' rights in the event of a change in the law governing divorce.[4] The remaining provisions govern the disposition of the parties' property interests and contain no references whatsoever to divorce or separation. They relate, instead, to the disposition of property upon the death of one or both of the parties and, particularly, to the post-mortem inheritance rights of the parties' sons. Husband's son, Jonathan, is identified in the Agreement as thirty-two years old, married with children, and currently living in Tokyo. Wife's son, David, is identified in the agreement as nineteen years old and "about to start his college sophomore year."

---

[4] The provision regarding incorporation was the stated basis for the trial court's ruling that the plain language of the Agreement was not ambiguous and that it required incorporation of the Agreement into the divorce decree. The provision addressing attorney's fees in the event of divorce has no bearing on whether the parties' property is to be divided pursuant to the Agreement. The remaining provision in which divorce is referenced in the Agreement, likewise, has no bearing on whether the parties intended that the Agreement, and not Virginia equitable distribution law, was to govern the distribution of any of their property in the event of divorce. A species of "choice of law" provision, it states that the parties waived

> any and all equitable distribution and community property rights which might arise in the future either as a result of relocation of either or both of us to a place which has community property laws and/or by a change in the laws of the Commonwealth of Virginia or of any other jurisdiction.

Indeed, if anything, this provision suggests that the parties contemplated that, in the event of divorce, Virginia equitable distribution law, current at the time the Agreement was executed, was to apply.

The Agreement sets forth a disposition plan for three categories of property: insurance, personal property, and real property. In each case, the provision identifies a primary and secondary beneficiary and speaks of the property interest in terms of a bequest.

With respect to life insurance, the Agreement provides that wife is to name husband as the beneficiary of a $100,000 individual term policy that she owned. Wife names her son, David, as the secondary beneficiary of the policy. In order to continue what the parties referred to as "a bond of protection between [wife] and [her son] David since his birth," the parties agreed that "if [wife] should die before David is settled on a life course after schooling, David is to receive a $100,000 payment as a bequest from his mother from the funds [wife] will bequeath to [husband], and as an initial disbursement to David of monies eventually due to him."

Wife's other life insurance policy, comprised of a group term policy through her work and initially amounting to about $260,000, was also addressed in the Agreement, which specified that husband was to be named the primary beneficiary of the policy and wife's son, David, was to be named the contingent beneficiary.

Wife also makes a bequest to her husband's son, Jonathan, stating, "To complement David's accelerated distribution in event of [wife's] death, Jonathan will receive a like $100,000 advance against his eventual bequest in the event [wife] predeceases [husband]."

With respect to personal property, the parties agreed to designate each other "as 100% primary beneficiary or transfer recipient, upon death, on all of our personal accounts (brokerage, 401-k, checking/savings, and the like). [Each party shall] designate [his/her] own son and any other heirs we [husband and wife] choose as contingent beneficiary of 100% of these accounts."

A formula identifies the party's son's share and the surviving spouse's responsibilities with respect to that share.[5]

The parties also provide for a disposition of the "non-monetary" portion of the personal property they owned, again to take effect upon their death:

> We agree that each other may keep and continue to use our furnishings and personal property, except as follows or has been directed by a Will. We plan to maintain a record of personal property in both FG [Fiddler's Green] and in Sarasota to identify pieces of significance which each of us brought to the marriage and pieces we acquired jointly.
>
> We agree that our sons may take from [the homes] any and all belongings and furnishings that belonged to his parent, which he desires to have in his own home and use, except for those items that have been designated in writing to remain with the survivor of either of us so long as (s)he lives. Either of us has the right to designate specific items of property to pass to ultimate/contingent heirs.

---

[5] Pursuant to that formula, a record of the deceased party's bequest of personal property is to be maintained by the survivor to ensure that the deceased party's son received his share of that parent's transferred asset:

> We agree that if one of us survives the other and thus becomes the 100% primary beneficiary of the other one's accounts, an "Allocation" will take place. This Allocation will attribute the <u>percentage</u> of all monetary (but NOT FG [Fiddler's Green] or Sarasota) out of the <u>total</u> monetary assets that have transferred to the surviving spouse. The survivor will maintain appropriate documentation of the Allocation, and will take all necessary steps to see that at the very least, the Allocation percentage will ultimately go to the son (or other designated contingent heirs) of the first decedent upon the death of the survivor. In other words, we agree that the survivor of us shall retain the use of the combined monetary assets during her/his lifetime for all support and living expenses, but that upon the second death, the Allocation percentage will govern distribution of the residual monetary assets to subsequent heirs.

(Emphasis in original).

> We wish our sons and other heirs a cooperative spirit of respect amongst them in sharing and sharing alike our family possessions of personal property after we are both dead.

With respect to Fiddler's Green and the Sarasota condominium, the distribution of which is challenged here, the Agreement addresses the titling of the parties' respective interests, each party's right to possession irrespective of title, and which party was to be charged with the costs of maintaining and/or improving the properties. In addition, the disposition of both pieces of real property is addressed, but specifically in the context of the death of one or, ultimately, of both parties. The Agreement provides that if wife predeceased husband, he had the

> right to live at FG [Fiddler's Green] and/or to occupy the property at any and all times for the rest of his life, and that the property may not be sold without his express written consent as long as he lives. We recognize and reaffirm a long-term lease that we have executed with [husband] as "tenant" as further confirmation of our agreement.[6]

Under the Agreement, the Sarasota condominium was to continue being held in joint title with the right of survivorship. Upon husband's death, the parties agreed that wife was to

> retain possession and use of the property during her lifetime (with responsibility to maintain it) and that [husband's son] and any other subsequent heirs [husband] indicates will inherit 100% of Sarasota upon [wife's] subsequent death. If [wife] dies before [husband], he shall retain 100% of Sarasota and its value separate from the Allocation of monetary assets or FG [Fiddler's Green].

---

[6] A long-term lease reflecting this portion of the Agreement was executed by the parties and was referenced in another provision of the Agreement as well. The two provisions are inconsistent with each other. The prior provision states:

> While we intend that [wife] shall continue to have sole title to FG [Fiddler's Green] *while she lives*, we have executed a long-term lease confirming [husband's] full and unfettered right of possession and/or occupancy at FG [Fiddler's Green]. Neither [wife] nor her executor or estate may sell FG [Fiddler's Green] without [husband's] express written consent until his death.

(Emphasis added).

Paralleling the provisions setting forth the disposition of the parties' personal property, the Agreement names the parties' sons as their contingent beneficiaries of these two pieces of real property:

> If we die at the same time, or after the death of the survivor of either of us, or if the survivor vacates FG [Fiddler's Green], the equity in FG [Fiddler's Green] will be divided and promptly paid such that our sons or other subsequent heirs will first receive the dollar value of his parent's equity interest (we'll refer to this as the "Basis Equity") . . . . Any outstanding Line of Credit or other claim against the value of FG [Fiddler's Green] will be deducted from [wife's] share.

A formula for calculating the "Basis Equity" which was to be paid the parties' respective sons upon the death of both or either party was set out in the Agreement.[7] Anticipating that the value of the real property at the time of the death of one or both parties (called the "current residual equity" in the Agreement) could exceed or fall below the dollar value of the "basis equity," the parties further specified how to calculate their "subsequent heirs'" share under those circumstances:

---

[7] A formula for calculating the "dollar value of [each party's] equity interest . . . (referr[ed] to as the 'Basis Equity')" in Fiddler's Green was set out in the Agreement:

> We agree that our respective equity interests (as distinct from title) in FG [Fiddler's Green] shall be as follows. [Wife] shall have an interest of $273,000 plus improvements she pays for from her earnings from work. [Husband] shall have an interest of $8,000 plus improvements he pays for (including but not limited to the planned renovation) plus any payments he makes toward the mortgage and note. . . . When [husband] pays for that renovation and/or makes payments toward the mortgage and note, he is likely to build up a majority equity percentage interest in FG [Fiddler's Green] over time.
>
> Regular payments on the FG [Fiddler's Green] mortgage, taxes and insurance will be paid by [wife] from her earnings while she works, and after that from our retirement incomes. [Wife's] payments toward [sic] mortgage and note, and maintenance over the course of her working over the next two years, are already included in her $273,000 equity interest above.

> [I]f the then-current residual equity in FG [Fiddler's Green] is <u>greater</u> than the initial Basis Equity, that residual equity will be divided and paid 50/50 to each of our subsequent heirs. If the equity value of FG [Fiddler's Green] is <u>less</u> than the Basis Equity, the value and distribution to each of our subsequent heirs will be proportionally reduced.

(Emphasis in original).

It was these formulas that the trial court used in the divorce proceeding to calculate the parties' respective interests in Fiddler's Green and the Sarasota condominium.

We conclude the trial court erred in so doing. Nothing in the language of these provisions regarding the disposition of Fiddler's Green or the formula set forth for calculating the parties' interest in the property indicates the Agreement is to govern the distribution of the property in the event of divorce.

Indeed, the parties' expressed intent in entering the Agreement is to the contrary. Four provisions in the Agreement reflect that intent. All four relate to the parties' post-mortem financial planning, beginning with the following:

> Our intent, individually and together, is to make fair financial arrangements to share our financial capabilities and at the same time to prepare ourselves and our respective sons for the ultimate eventuality of our deaths. . . . [T]his Agreement is not a Will or testament, but it describes our commitment to post-mortem financial arrangements that will help each of us deal with financial consequences of the other's death.

The parties' intent that intrafamily conflicts after their deaths be avoided was the subject of another provision, corroborating the parties' intent to make post-mortem financial arrangements for each other and for their heirs:

> [T]his Agreement is our effort to clarify and to concretize our commitments to each other so as to minimize any misunderstandings or conflicts between a surviving spouse and the children, or between the children after our deaths. We are trying to inform and to guide them as to our intentions and desires.

The parties intended that their sons continue to live or visit at Fiddler's Green after wife's death, and they expressed this intent as follows:

> We recognize how important FG [Fiddler's Green] is as a home and as a piece of family tradition to both [wife] and David. If [wife] dies before [husband], he agrees to share the FG [Fiddler's Green] home with David until David reaches the age of 21; beyond that age, [husband] welcomes David's and/or Jonathan's visiting and staying overnight throughout their lifetimes.

The parties also considered the ultimate value of their respective son's inheritance under the Agreement and, recognizing that their plan would "somewhat enlarge David's ultimate inheritance and somewhat reduce Jonathan's ultimate inheritance from what each of us individually might have bequeathed to them," they included a provision explaining their intent and rationale for the potentially unequal bequests:

> We believe that David's younger age and less-established station in life deserve some assistance, and we hope that Jonathan will agree that although he (at least now) has greater obligations than David has (Jonathan has two children), Jonathan is also more financially established than David is at this time and will not be injured by this financial allocation.

Finally, the testamentary nature and purpose of the Agreement is addressed by a provision that includes a disincentive to deviate from that purpose:

> [I]f either [Husband or Wife] . . . makes a Will or executes a Trust . . . contravening any provisions of this Agreement, the other . . . will have a valid, meritorious and enforceable claim against the person making that Will or Trust and/or that person's estate, and . . . the claimant will be indemnified by the other and/or the other's estate for all legal fees and costs necessary to enforce this Agreement against any such Will or testament or Trust.

The parties qualified this restriction, specifying that in the event they divorced, the restriction on their right to make testamentary arrangements in contravention of those set out in the Agreement would no longer apply.

In discerning the intention of the parties, the court must bear in mind "'the situation of the parties, the subject matter of the agreement and the object which the parties intend to accomplish.'" Reid v. Boyle, 259 Va. 356, 367, 527 S.E.2d 137, 143 (2000) (quoting High Knob, Inc. v. Allen, 205 Va. 503, 507-08, 138 S.E.2d 49, 53 (1964) (internal quotations omitted)). "Words used by the parties are normally given their usual, ordinary and popular meaning." Winn v. Aleda Constr. Co., 227 Va. 304, 307, 315 S.E.2d 193, 194-95 (1984) (citing Ames v. American Nat. Bank, 163 Va. 1, 39, 176 S.E. 204, 217 (1934)).

"'In construing a contract . . ., the intention of the parties must be ascertained from the entire instrument.'" Bott v. N. Snellenburg & Co., Inc., 177 Va. 331, 339, 14 S.E.2d 372, 374 (1941) (quoting Harrity v. Continental-Equitable Title & Trust Co., 124 A. 493, 494 (Pa. 1924)). An expression to which a plain meaning is attached in one part of an instrument will be held to have the same meaning in other parts of the same instrument unless a contrary purpose plainly appears.

Here, the trial court concluded that the parties intended that the provisions in their Agreement regarding Fiddler's Green and the Sarasota condominium were to be applied in equitably distributing those pieces of real property in the divorce proceeding, and it, accordingly, applied the Agreement's formulas to calculate the parties' interests in those assets.[8] We reverse that decision on the following grounds.

First, the language of the provisions provides no basis for the result the trial court reached. A review of each provision in the Agreement regarding the treatment of property, both

---

[8] Applying the formula in the Agreement for determining the parties' respective interests in those properties, the trial court awarded husband $697,573 for his interest in Fiddler's Green and ordered the Sarasota condominium to be retitled in husband's sole name. It awarded wife Fiddler's Green, less husband's interest, and a future interest in the Sarasota condominium.

- 15 -

real and personal, shows they refer solely to the time of the parties' death.  No reference is made to an intended distribution of property incident to divorce.

Second, the trial court's construction fails to consider the Agreement as a whole and ignores the clear meaning of the same words used in other parts of the Agreement which the court, tellingly, concluded required the application of the Agreement solely upon death.  To be sure, as argued by husband, the parties stated they intended to treat Fiddler's Green and the Sarasota condominium "differently" from the parties' personal property.  However, it does not follow from the word "differently" that the parties intended to exclude Fiddler's Green and the Sarasota condominium from the testamentary parameters of the Agreement.  Indeed, the only difference that emerges from our review of the plain language of the provisions in question is the difference in the formula to be used to value the parties' personal property and the provision to be applied in valuing their interests in Fiddler's Green and the Sarasota condominium.  But, neither the formula for valuing the parties' personal property interest nor the formula for valuing their interests in Fiddler's Green and the Sarasota condominium speaks in any respect to divorce as the circumstance governing their application.  No explanation is found in the record addressing how or why a simple difference in the formula for evaluating the parties' respective interests in their personal and real property compels the conclusion the trial court reached.  Indeed, the formula for calculating the parties' respective interests in Fiddler's Green and the Sarasota condominium, by its language discussing the parties' "Basis Equity," relates back to the provision providing for the payment of each party's equity in Fiddler's Green to their sons or subsequent heirs upon the parties' deaths.

Finally, we note the trial court's construction essentially and improperly treats as meaningless the words of bequest in the provisions governing the disposition of Fiddler's Green and the Sarasota condominium.  "'[N]o word or clause is to be treated as meaningless if any

- 16 -

reasonable meaning consistent with the other parts of the contract can be given to it.'" <u>Hutter v.</u>

<u>Heilmann</u>, 252 Va. 227, 231, 475 S.E.2d 267, 270 (1996) (quoting <u>Vega v. Chattan Assocs.</u>, 246

Va. 196, 199, 435 S.E.2d 142, 143 (1993)). <u>See also</u> Restatement (Second) of Contracts, § 202

cmt. d (1981) ("Where the whole can be read to give significance to each part, that reading is

preferred . . . .").

We find in our *de novo* review of the Agreement that it is not ambiguous or vague as to

whether the Agreement applies to the distribution of the property in the case of divorce, but

rather it is quite clear within the four corners of the document.

In support of his contention that the provisions regarding Fiddler's Green and the

Sarasota condominium were to govern in the event of the parties' divorce, husband argues that

the trial court "heard exhaustive testimony regarding the parties' intent with regard to the

Agreement" and that the testimony establishes the Agreement applies both in the context of

divorce and upon death. Husband's citations to the record, however, fail to support the argument

advanced.[9] Husband cites the trial court's opinion letter and to his counsel's argument regarding

---

[9] The testimony cited is limited to

The conclusion of the trial judge regarding the parties' intent in his opinion letter of February 17, 2009.·
The argument of husband's counsel regarding the construction of the Agreement.·
Husband's testimony that he thinks that the "express intent is a combination of two sections in the document. . . . One of those two sections is the . . . fourth paragraph of page 2 . . . that says we waive equitable distribution in two limited circumstances. So that I believe that the language of paragraph 4 on page 2 expressly establishes that equitable distribution should operate in the event of divorce. And that has to be read collaboratively [sic] with page 4, paragraph 3, which expressly excludes from equitable distribution the two parcels of real estate, Fiddlers Green and Sarasota."
Husband's testimony that "In the event of divorce or death, death inevitable, that the document provides a formula for allocating or dividing the equity interests in those two pieces of property."
Husband's testimony that he "had concerns about protecting the money that I was going to be putting into [wife's] house, so that it would ultimately all come back either to me in the event of divorce or come back to my son and grandchildren after both of us were dead."

- 17 -

the construction of the Agreement; neither constitutes testimony. Husband's testimony expressing his opinion that the document provides a formula for dividing the parties' real property interests "in the event of divorce" is, at best, a commentary on the Agreement's language that is of no import in construing a contract. "A contract is not deemed ambiguous merely because the parties disagree as to the meaning of the language they used to express their agreement." Ross v. Craw, 231 Va. 206, 212-13, 343 S.E.2d 312, 316 (1986) (citing Wilson, 227 Va. at 187, 313 S.E.2d at 398). "Contracts are not rendered ambiguous merely because the parties or their attorneys disagree upon the meaning of the language employed to express the agreement." Doswell Ltd. Partnership v. Virginia Electric & Power Co., 251 Va. 215, 222-23, 468 S.E.2d 84, 88 (1996) (citing Wilson, 227 Va. at 187, 313 S.E.2d at 398).

Finally, husband's testimony regarding his concerns about "protecting his money" and that it was to "all come back either to [him] in the event of divorce or come back to [his] son and grandchildren after both of us were dead," constitutes extrinsic evidence that cannot be used to contradict or vary the terms of a valid written instrument. Tuley v. Barton, 79 Va. 387, 392 (1884) (parol evidence cannot be "received to engraft upon, or incorporate with a valid written contract, an incident occurring contemporaneously therewith and inconsistent with its terms. In other words, no new words can be added, nor, when the meaning is clear and unambiguous, can any other construction be given than what the written words naturally import."). "'Where a contract is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself.'" Pellegrin v. Pellegrin, 31 Va. App. 753, 759, 525 S.E.2d 611, 614 (2000) (quoting Harris v. Woodrum, 3 Va. App. 428, 432, 350 S.E.2d 667, 669 (1986)).

In summary, no provision in the Agreement expressly excludes the parties' real property interests in Fiddler's Green and the Sarasota condominium from equitable distribution pursuant

to Code § 20-107.3 or expressly brings the distribution of those interests within the Agreement's reach as argued by husband.  There is no basis from which to conclude, expressly or by implication, that the parties intended the Agreement to apply in the context of divorce.

For the reasons stated here, we, therefore, find that the trial court erred in its application of the Agreement to the distribution of the parties' real property interests in Fiddler's Green and the Sarasota condominium.[10]

III.

DID THE COURT ERR IN ITS APPLICATION OF CODE § 20-107.3 IN THE EQUITABLE DISTRIBUTION OF THE PARTIES' ASSETS BY FAILING TO PROPERLY CLASSIFY AND VALUE PROPERTY, IMPROPERLY APPLYING THE BURDEN OF PROOF IN THE TRACING OF ASSETS, AND FAILING TO CONSIDER THE FACTORS IN CODE § 20-107.3(E)?

A.

Wife argues that the trial court failed to value the parties' real property interests which, in addition to Fiddler's Green and the Sarasota condominium, included a property referred to as the 1600 Oak Street property and properties held by limited partnerships and limited liability companies.[11]

Because the trial court erroneously addressed the parties' property interests in Fiddler's Green and the Sarasota condominium pursuant to the parties' Agreement and did not apply the principles of the equitable distribution statute, the trial court did not provide a value for the two properties in question.  Its failure to do so constitutes error.  See Code § 20-107.3(A) ("the court . . . shall determine the . . . value of all property, real or personal, tangible or intangible . . .").

---

[10] Because we conclude that the trial court erred in applying the Agreement to the distribution of Fiddler's Green and the Sarasota condominium, we need not address wife's additional argument that the court's distribution of the properties was not based on proper evidence of each party's contribution to the property.

[11] The 1600 Oak Street property is also referred to as the Arlington condominium, which is discussed in Section I of husband's cross-error below.

- 19 -

The River Oak LP property and the properties held by the limited partnerships and limited liability companies, on the other hand, were addressed pursuant to the equitable distribution statute. However, the trial court did not determine the value of River Oak LP. That failure constitutes error.

Likewise, the trial court failed to value the limited partnerships and limited liability companies, instead holding that they, except for Atlantic Psychiatry Group, were husband's separate property. "This statute [Code § 20-107.3] mandates that the court determine the ownership and value of all real and personal property of the parties." Hodges v. Hodges, 2 Va. App. 508, 516, 347 S.E.2d 134, 139 (1986). Here, the trial court erred when it failed to value River Oak LP and Atlantic Psychiatry Group, which it classified as marital. Its equitable distribution of these two properties is, therefore, reversed.

The trial court also failed to value the remaining limited partnerships and limited liability companies, which were classified as separate. However, the error is harmless because it was not relevant to the equitable distribution award. See McDavid v. McDavid, 19 Va. App. 406, 413, 451 S.E.2d 713, 718 (1994).

B.

Wife further argues that the trial court erred in awarding husband a separate interest in Fiddler's Green and its decision should be reversed on the ground husband failed to meet his burden of proving the identity of his separate interest in the hybrid property and failed to trace that portion to a separate asset. See generally Rahbaran v. Rahbaran, 26 Va. App. 195, 494 S.E.2d 135 (1997); von Raab v. von Raab, 26 Va. App. 239, 494 S.E.2d 156 (1997). She also contends the trial court erred because husband failed to prove that any separate property contributions he made increased the value of wife's separate property, citing Rinaldi v Rinaldi, 53 Va. App. 61, 73, 669 S.E.2d 359, 365 (2008) ("'It is the *value* that improvements add to the

- 20 -

property, not their cost, that is the proper consideration because the court is apportioning the *equity* in the hybrid property when it traces the sources of contributions to that property.'" (emphasis in original) (quoting Hart v. Hart, 27 Va. App. 46, 66, 497 S.E.2d 496, 505 (1998))). Because the trial court erroneously applied the parties' Agreement to determine their interest in Fiddler's Green, it failed to apply the correct principles governing tracing in its distribution of Fiddler's Green. Its decision is, therefore, reversed and the matter remanded for consideration under the equitable distribution statute.

C.

Wife limits her argument that the court failed to consider all the factors under Code § 20-107.3 to her claim that the court erred in failing to consider the tax consequences resulting from husband's business deductions in making its equitable distribution award. Wife's expert testified as to the potential tax liability facing the parties and informed her that she should consider amending the tax returns and retaining a tax attorney. The IRS had neither investigated the parties' tax returns nor conducted an audit, and no tax liability existed at the time of the trial. On that ground, the trial court found no evidence of actual tax liability and, because the claim of potential tax liability was speculative, there were no tax consequences to consider.

We find no error in the trial court's conclusions on this issue.

> Code § 20-107.3(E)(9) . . . does not mandate that a trial court reduce an award for potential capital gains tax consequences no matter how certain or uncertain they may be. Subsection E(9) requires only that the trial court *consider* tax consequences when formulating an equitable distribution award. What weight, if any, to assign to this factor in the overall decision lies within the trial court's sound discretion.

Owens v. Owens, 41 Va. App. 844, 859, 589 S.E.2d 488, 496 (2003). We find the trial court did not err in concluding there were no tax consequences to consider in making its award.

- 21 -

IV.

DID THE COURT COMMIT LEGAL ERROR IN UPHOLDING THE
VALIDITY OF THE LEASE?

Wife argues that the trial court erred in finding that the lease was valid. First, wife contends the lease was not entered into evidence and reviewed by the trial court. However, the trial court admitted the lease as a joint exhibit,[12] and reviewed the lease and addressed it in its letter opinion.

Second, wife argues that the lease "does not rise to the level of an enforceable contract" because it does not specify a sum for rent or a formula to establish the amount. The lease states, "Tenant [husband] warrants to undertake to provide funds sufficient to pay principal, interest, HOA fees and taxes on the premises/property beginning in January, 2007 and extending through the subsequent period of occupancy of the property by tenant for the remainder of this Lease."[13] The trial court concluded that "[t]here was a definite lease term of 40 years and the rent was to be paid by the Defendant [husband] in the amount of the monthly mortgage payments, interest, HOA fees, and taxes on the property. The Court finds that this is a specific rental amount and thus there is a valid lease."

We find no error in the trial court's rejection of wife's contention that the lease was not valid on this ground. See Allen v. Aetna Casualty & Surety Co., 222 Va. 361, 364, 281 S.E.2d 818, 820 (1981) (Where there is no sum specified in the agreement, nor any method or formula set out for determining the amount, the mutual assent of the parties to the terms is lacking and the contract is not enforceable.); Davis v. Cleve Marsh Farm Hunt Club, 242 Va. 29, 34, 405

---

[12] The lease was accepted into evidence as Joint Exhibit 2. Counsel for appellant noted for the trial court, "We agree that [Joint Exhibits] 1 and 2 come into evidence. That's the prenuptial agreement, Judge, and the document called the lease."

[13] The term of the lease was defined as forty years.

S.E.2d 839, 842 (1991) ("[A] lease renewal provision that does not set forth an agreed rental is invalid and unenforceable, absent a specified method or guideline for fixing rent."); see also Phipps v. Storey, 601 S.W.2d 249, 252 (Ark. 1980) ("Where the annual rental is not agreed upon and the contract does not otherwise provide a manner for its definite determination, the contract does not meet this test [of certainty]."). Here, the trial court properly determined that the lease provided "a specific method or guideline for fixing [the] rent" to be paid, viz., the sum of the "principal, interest, HOA fees and taxes."

Wife also argued that the lease was invalid because it did not provide "definitive terms" by which a remedy for potential breach could be determined. Wife cites two cases in her brief, but neither supports her argument.[14] Wife's failure to provide legal authority to support her argument is significant, and we will, therefore, not consider it. Parks v. Parks, 52 Va. App. 663, 664, 666 S.E.2d 547, 548 (2008); see Rule 5A:20(e) (appellant's opening brief shall include "[t]he principles of law, the argument, and the authorities relating to each question presented . . .").

V.

DID THE COURT COMMIT LEGAL ERROR IN ORDERING THE TRANSFER OF
SEPARATE PROPERTY?

The trial court found that, under the Agreement, the Sarasota condominium, which was held jointly, was to remain husband's separate property and it, accordingly, re-titled the property in husband's name. Wife claims the Agreement does not confer jurisdiction on the court to transfer the separate property. Since we hold the trial court erred in applying the Agreement to distribute the parties' interests in Fiddler's Green and the Sarasota condominium, and we remand

---

[14] Wife cites Valjar, Inc. v. Maritime Terminals, 220 Va. 1015, 1018, 265 S.E.2d 734, 737 (1980), and Progressive Constr. Co. v. Thumm, 209 Va. 24, 30-31, 161 S.E.2d 687, 691 (1968).

the case for further proceedings under the equitable distribution statute, we need not address this question.

HUSBAND'S CROSS-ERROR

I.

DID THE COURT ERR BY AWARDING WIFE A SEPARATE INTEREST IN THE ARLINGTON CONDOMINIUM?

Husband argues that the trial court erred in awarding wife $56,367, an amount the court found represented her "marital equity" in the Arlington condominium, which was husband's primary residence after the separation. We disagree.

On July 30, 2007, husband created JDICO, LLC (JDICO) in anticipation of divorce. JDICO's main asset, the Arlington condominium, was purchased with two separate payments. Husband argues one payment was in the form of a $30,000 check that was drawn on a joint account (Fidelity IMA 0546), but which husband contends he traced to his separate assets. A second payment was in the form of a $226,950 wire from another Fidelity brokerage account (Fidelity 1186) that husband contends the trial court found to be his separate asset.

Husband correctly argues that the trial court held the Fidelity 1186 brokerage account was husband's separate property, as evidenced in its award of the account to him as his separate property in the divorce decree. Wife does not challenge that finding and award on appeal. The inquiry remains, then, whether the trial court erred in its finding that the funds drawn from the Fidelity IMA 0546 account in the amount of $30,000 were marital and that husband failed to trace the funds to his separate property.

"'[U]nless it appears from the record that the chancellor has abused his discretion, that he has not considered or has misapplied one of the statutory mandates, or that the evidence fails to support the findings of fact underlying his resolution of the conflict in the equities,'" the trial court's award of equitable distribution will not be reversed on appeal. von Raab, 26 Va. App. at

- 24 -

246, 494 S.E.2d at 159 (quoting <u>Robinette v. Robinette</u>, 10 Va. App. 480, 486, 393 S.E.2d 629, 633 (1990) (citations omitted)).

The Fidelity IMA 0546 account from which the check for $30,000 was drawn is jointly titled and presumed to be marital. "Marital property is . . . all property titled in the names of both parties . . . ." Code § 20-107.3(A)(2). Husband argued that this account was not marital property, and it was his burden to prove what portion, if any, was separate.

> Whether a transmuted asset can be traced back to a separate property interest is determined by the circumstances of each case, including the value and identity of the separate interest at the time of the transmutation. . . . The party claiming a separate interest in transmuted property bears the burden of proving retraceability. If the party claiming the separate interest in transmuted property proves retraceability, the burden shifts to the other party to prove that the transmutation of the separate property resulted from a "gift."

<u>von Raab</u>, 26 Va. App. at 248, 494 S.E.2d at 160 (citations omitted).

As this Court previously held, where separate property has been commingled with marital property, the trial court must be able to identify the separate amount and "'compute the ratio [between the separate and marital assets] and trace both interests.'" <u>Rahbaran</u>, 26 Va. App. at 208-09, 494 S.E.2d at 141-42 (quoting Brett R. Turner, <u>Equitable Distribution of Property</u> 266 n.591 (1994)). If the party cannot present evidence from which the court can determine the party's separate asset, the property is transmuted and becomes marital property. <u>Id.</u> at 208, 494 S.E.2d at 141. <u>See also</u> <u>Gilman v. Gilman</u>, 32 Va. App. 104, 122, 526 S.E.2d 763, 772 (2000); <u>Barker v. Barker</u>, 27 Va. App. 519, 533, 500 S.E.2d 240, 246 (1998).

At trial, husband presented a chart to show the source of funds for the jointly titled Fidelity IMA 0546 account. However, the chart does not directly trace the funds for the $30,000

check to husband's separate assets. Other than the chart, husband cites no other evidence to this Court to support his contention.[15]

Thus, although husband met his burden of proving that a substantial portion of the purchase costs for the Arlington condominium was paid from his separate assets held in the Fidelity 1186 account, he was unable to establish that the remaining funds used to purchase the property came solely from his separate assets in the jointly held Fidelity IMA 0546 account, the other account used for the payment of the condominium costs.

Therefore, on this record, which shows that both marital and separate funds were used to purchase the Arlington condominium, we find that the trial court did not err in concluding that husband failed to meet his burden of proving the Arlington condominium was his separate property and in finding wife had an interest in the property.[16]

II.

DID THE COURT IMPROPERLY CLASSIFY MULTIPLE INTERESTS AS WIFE'S SEPARATE PROPERTY?

Wife was employed at SAIC, and she was awarded various stock options and restricted stock awards as a result of her employment.

Husband argues the trial court improperly classified wife's Mellon One account as her separate property. We disagree.

Wife exercised 600 marital stock options and funded the purchase of this stock during the marriage using her separate funds. After the purchase, wife transferred the stock to a holding

---

[15] "We will not search the record for errors in order to interpret the appellant's contention and correct deficiencies in a brief." Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992). The appendix in this case is 5,890 pages and thirteen volumes. The attorneys failed to direct the Court to the evidence that supports their arguments that the trial court erred in its ruling on classification, so they will not be considered.

[16] The amount the trial court awarded wife representing her interest in the Arlington condominium is not before us on appeal. We, therefore, need not address the issue.

account within her Mellon One account. Husband contends the difference between the strike price[17] and the fair market value on the date of purchase of the exercised options is marital property. Using his formula, husband argues 88 shares were marital property, and 512 shares were wife's separate property and that the trial court should have ordered wife to transfer one-half of the 88 shares to him.

He also argues there is no evidence that wife's remaining unrestricted shares of SAIC stock (1,099.9308 shares minus the 600 stock options wife exercised) in wife's Mellon One account are wife's separate property and that the trial court's ruling should be reversed.

Rule 5A:21(d) states that "the brief of the appellee shall contain . . . [t]he principles of law, the argument, and the authorities relating to each question presented." Husband did not present any legal authority for his contention that the trial court erred in classifying these shares as wife's separate property. This error is significant, and we will not consider these questions. See Jay, 275 Va. at 520, 659 S.E.2d at 317.

Finally, husband argues that the trial court erred in holding that wife's unexercised SAIC stock options, her restricted SAIC stock awards, and her CEO stock award (collectively referred to as the SAIC Newport Group Restricted Stock Award) were her separate property.

Wife explained to the trial court that she could not exercise the SAIC Newport Group Restricted Stock Award unless she was employed at SAIC in 2011. Since the vesting of this award was conditioned upon wife's continued employment, her right to these shares would not vest until after the parties' separation and divorce. Consequently, the trial court did not err in classifying the SAIC Newport Group Restricted Stock Award as her separate property. See Shiembob v. Shiembob, 55 Va. App. 234, 242, 685 S.E.2d 192, 196 (2009) (trial court erred in

----

[17] Strike price is "[t]he price for which a security will be bought or sold under an option contract if the option is exercised." Black's Law Dictionary 1308 (9th ed. 2009).

holding that husband's restricted stock shares were marital property because they did not vest until after the parties' separation); Ranney v. Ranney, 45 Va. App. 17, 33-34, 608 S.E.2d 485, 493 (2005) (trial court erred in holding that husband's stock options were his separate property because although they were acquired before the marriage, they vested after the parties' marriage); Cirrito v. Cirrito, 44 Va. App. 287, 293-94, 605 S.E.2d 268, 271 (2004) (funds received by husband as a result of a non-compete agreement were marital because his right to receive the funds occurred during the marriage, after he complied with the non-compete agreement).

III.

DID THE COURT ERR IN CLASSIFYING WIFE'S VEHICLE AS<br>HER SEPARATE PROPERTY?

Husband argues that the trial court erred in holding that wife's vehicle was her separate property.

"Because the trial court's classification of property is a finding of fact, that classification will not be reversed on appeal unless it is plainly wrong or without evidence to support it." Ranney, 45 Va. App. at 31-32, 608 S.E.2d at 492 (citing McDavid, 19 Va. App. at 407-08, 451 S.E.2d at 715, and Srinivasan v. Srinivasan, 10 Va. App. 728, 732, 396 S.E.2d 675, 678 (1990)).

Prior to the marriage, wife purchased a vehicle with the assistance of a loan. On July 6, 2004, husband wrote a check, in the amount of $9,907.84, to pay off the loan. The check was from a joint account. Husband argues that he primarily used the account and testified that wife's name was on the account "to facilitate her access to the account if [he] got sick." Therefore, he contends he has a separate interest in the car in the amount of $9,907.84 and that he should be reimbursed the full amount. On this record, we conclude that husband did not prove that he had a separate interest in the car because the checking account from which the funds were drawn to pay off the loan was jointly titled prior to the marriage. Since husband did not prove that he used

- 28 -

his separate funds to pay off the car loan, we find that the trial court did not err in concluding that the vehicle remained wife's separate property because she purchased it before the marriage.[18]

IV.

DID THE COURT ERR IN CONSIDERING MONIES WIFE WITHDREW FROM<br>HUSBAND'S BANK ACCOUNT?

Husband contends the trial court failed to find that wife wasted and dissipated $15,100 from a joint account, which husband primarily used. Husband contends wife's withdrawal of the funds constituted waste and that wife failed to show by a preponderance of the evidence that the funds were used for a proper purpose.[19] On those grounds, he argues that he should have been awarded one-half the value of the account before it was dissipated.

Wife admitted withdrawing the funds and explained she initially wrote "a couple of checks" for marital bills. She further testified that she then realized that husband had moved money from a Virginia bank account to a Florida bank account right after the separation and that she "was concerned about what was happening, in terms of money and having enough, because this was just at the point of separation." There is no further testimony about the use of the marital funds.

Waste has been defined as the "dissipation of marital funds in anticipation of divorce or separation for a purpose unrelated to the marriage and in derogation of the marital relationship at

---

[18] "'[P]roperty acquired before marriage is presumed to be separate.'" Rahbaran, 26 Va. App. at 209, 494 S.E.2d at 142 (quoting Barnes v. Barnes, 16 Va. App. 98, 104, 428 S.E.2d 294, 299 (1993)); see Code § 20-107.3(A)(1).

[19] Wife notes that husband did not make this argument during the trial, and she contends that he waived the argument. In a bench trial, a party can preserve his issues for appeal in a motion to strike, in closing argument, in a motion to set aside the verdict, or in a motion to reconsider. Lee, 12 Va. App. at 515, 404 S.E.2d at 738. Here, husband first raised the issue in his motion to reconsider and, thus, preserved the issue.

a time when the marriage is in jeopardy." Booth v. Booth, 7 Va. App. 22, 27, 371 S.E.2d 569, 572 (1988).

"Once the aggrieved spouse shows that marital funds were either withdrawn or used after the breakdown, the burden rests with the party charged with dissipation to prove that the money was spent for a proper purpose." Clements v. Clements, 10 Va. App. 580, 586, 397 S.E.2d 257, 261 (1990) (citations omitted). "[T]he use of funds for living expenses while the parties are separated does not constitute dissipation." Id. (citations omitted).

> [T]he expenditure of marital funds for items such as voluntary support, living expenses, attorney's fees, and other necessities of life constitutes a valid marital purpose and is not waste. See, e.g., Anderson v. Anderson, 29 Va. App. 673, 695, 514 S.E.2d 369, 381 (1999) (mortgages, credit cards); Alphin v. Alphin, 15 Va. App. 395, 402, 424 S.E.2d 572, 576 (1992) (voluntary support, medical bills for wife); Amburn v. Amburn, 13 Va. App. 661, 414 S.E.2d 847 (1992) (personal living expenses, attorney's fees, child's tuition, car loans); Clements v. Clements, 10 Va. App. 580, 397 S.E.2d 257 (1990) (household expenses, child's tuition).

Thomas v. Thomas, 40 Va. App. 639, 645, 580 S.E.2d 503, 506 (2005).

"When waste has occurred, the court must include the wasted assets as marital property and must consider the waste as a factor in determining the monetary award." Booth, 7 Va. App. at 28-29, 371 S.E.2d at 573.

In this case, wife provided no verifiable explanation or accounting of how she spent the $15,100 she withdrew from marital funds; her expression of concern about finances is not sufficient to meet the requisite burden of proof on this issue. Cf., Alphin, 15 Va. App. at 403, 424 S.E.2d at 576 (husband submitted a "detailed list of funds that the parties held on the date they separated and a complete list of each expenditure he made from these assets."); Amburn, 13 Va. App. at 666, 414 S.E.2d at 850 (wife "presented a full accounting of her use of the line of credit"). Accordingly, we find that the trial court erred in failing to include the funds as marital

property and consider them in fashioning its equitable distribution award.  We reverse and remand the issue for further consideration by the trial court.

## CONCLUSION

For the reasons discussed above, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and remanded.</u>